## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

**BRACH EICHLER LLC**
Keith Roberts, Esq. (043681993)
Stan Barrett, Esq. (378872021)
Cara Joy Skelley, Esq. (409032023)
101 Eisenhower Parkway
Roseland, New Jersey 07068
Phone: 973-228-5700
*Attorneys for Plaintiffs, Jack Corradino,*
*Gina Corradino Hanley, and*
*JCP Enterprises 1 LLC*

| | |
|---|---|
| JACK CORRADINO, GINA CORRADINO HANLEY, AND JCP ENTERPRISES 1 LLC, <br><br> *Plaintiffs*, <br><br> v. <br><br> GERMAN SHESTAKOV, GENNADIY SHESTAKOV, STANLISAV SHESTAKOV, RUDOLF (A/K/A RUVANE) YAGUDAYEV, EUGENE MIGIROV, FLEXFILLS LLC, FLEXFILLS DIGITAL LTD., FEHU CAPITAL LLC, FEHU CAPITAL L.P., TRADE FLOW TECHNOLOGIES, INC., SHESTAKOV ENTERPRISES LLC, YEHUDA CAPITAL LLC, JOHN DOES 1 – 10, AND ABC CORPS 1 – 10, <br><br> *Defendants*. | CIVIL ACTION NO.: _____ <br><br><br> **COMPLAINT** <br><br> PLAINTIFFS DEMAND TRIAL BY JURY |

Jack Corradino ("Corradino"), Gina Corradino Hanley ("Hanley"), and JCP Enterprises 1

LLC ("JCPE," and together with Corradino and Hanley, "Plaintiffs") file this Complaint against

German Shestakov, Gennadiy Shestakov, Stanislav Shestakov, Rudolf (a/k/a Ruvane) Yagudayev,

and Eugene Migirov (collectively, the "Individual Defendants"), and certain companies formed

and/or operated by the Individual Defendants, FlexFills LLC ("FlexFills"), FlexFills Digital Ltd.

1

("FF Digital"), Fehu Capital Partners, LLC ("Fehu Capital"), Fehu Capital, LP ("Fehu"), and Trade Flow Technologies, Inc. ("Trade Flow") (collectively the "Crypto Companies" or the "Companies," and together with the Individual Defendants, "Defendants"), based upon the following allegations:

## NATURE OF THE ACTION

1.      This is an action to recover more than $1.5 million of $4.2 million that Plaintiffs invested in the fraudulent Crypto Companies organized and operated by the Individual Defendants, who solicited Plaintiffs' funds based on assurances that the Crypto Companies were sound investments with fantastic prospects for exponential growth, sizeable and reliable returns, or both. In reality, these companies were designed to be looted by the Individual Defendants, who vied amongst themselves to take what they could as the Companies' prospects for operational success — if any ever existed — vanished entirely.

2.      Plaintiff Corradino also seeks to recover $250,000 each from Shestakov and Yagudayev individually, for digital assets that Shestakov and Yagudayev knew to be worthless at the time they sold them to Corradino. Shestakov and Yagudayev induced Corradino to acquire these assets by insisting that the sale proceeds would be reinvested in the Crypto Companies; but in reality, Shestakov and Yagudayev always intended to make personal use of the funds, which is what they did.

3.      The Individual Defendants used an acquaintance of Corradino's, Peter Polombo ("Polombo"), to win Corradino's confidence. Polombo became affiliated with the Crypto Companies initially by volunteering to assist with what he believed to be a very promising set of endeavors. He later received payments for his efforts and was even persuaded to assume temporarily the title of Money Laundering Reporting Officer for one of the Companies; but

Polombo was never privy to how the Companies actually operated, never had access to accurate information about the performance of the Companies, and was relegated to performing ministerial functions. Nevertheless, Polombo — whom Yagudayev referred to as a "victim" in his Complaint — was a true believer in the Crypto Companies stratospheric potential.

4. Using Polombo to gain access to Corradino, Individual Defendants sold Corradino a vision—that the Individual Defendants had identified certain market niches in the crypto industry that they could profitably and reliably exploit (i) by creating a crypto trading platform to cater to institutional investors and (ii) by launching a hedge fund that, in addition to providing the trading platform with a reliable institutional client, would utilize an arbitrage strategy and high-volume trading to profit from crypto currency price disparities.

5. They also assured Plaintiffs that these investments were safe, with extraordinary potential for growth and returns.

6. Even while presenting these grand plans to Plaintiffs — such that Plaintiffs ultimately invested approximately $4.2 million in FlexFills, FF Digital, and Fehu from 2022 to 2025 — the Individual Defendants knew that the Crypto Companies were bereft of internal controls and hemorrhaging cash; that their legal compliance functions were woefully deficient, if they existed at all; that the Individual Defendants regularly and improperly utilized funds invested in one Crypto Company to pay operating expenses for other companies under the Individual Defendants' control; that German Shestakov ("Shestakov") and Rudolf Yagudayev ("Yagudayev") utilized investor and company funds to pursue trades for their own personal benefit; and that both Shestakov and Yagudayev had a demonstrated penchant for misappropriating company and investor funds.

7. More than that, however, Yagudayev — who served as the Chief Operating Officer for FlexFills, FF Digital, and Fehu — knew with absolute certainty that Shestakov's use of investor and company funds for his own trades or for other improper purposes had previously resulted in hundreds of thousands of dollars in losses for companies under Shestakov's control, that Shestakov was never held to account for this earlier malfeasance, and that the Crypto Companies' internal controls were *incapable* either of preventing Shestakov from continuing to treat the Crypto Companies as a personal bank or of catching him when he did.

8. Despite knowing all of this, Yagudayev persisted in arranging for and accepting Plaintiffs' substantial investments in the Crypto Companies without ever warning them of the extreme and known risks to which Plaintiffs' investments were subject.

9. Plaintiffs are not merely speculating about what Yagudayev knew and when—in August 2025, after Shestakov and Yagudayev had a falling out, Yagudayev sued Shestakov and others of the Defendants in an action still pending in the Superior Court of New Jersey, Bergen County Chancery Division (Docket No. BER-C-196-25).

10. In his complaint (the "Yagudayev Complaint" or "Complaint"), Yagudayev alleges in detail that, long before Plaintiffs invested in any of the Crypto Companies, Yagudayev knew about the risks that Shestakov's improper conduct posed to the Crypto Companies and that there were no internal controls, procedures, or compliance functions at any of the Crypto Companies that could prevent Shestakov from plundering them.

11. After the Crypto Companies' operations began to unravel completely and Yagudayev was forced out by Shestakov, Shestakov's father Gennadiy ("Gen. Shestakov"), and Eugene Migirov ("Migirov"), Yagudayev became convinced that his own investments of time and money in the Crypto Companies were at risk.

12.     As detailed in his Complaint, in the weeks prior to filing it, Yagudayev finally undertook an investigation of crypto trades ostensibly performed on the Companies' behalf, utilizing specially purchased audit tools and digital ledgers publicly available on the blockchain.

13.     As detailed in his Complaint, Yagudayev found a litany of illegal conduct: surreptitious and unauthorized withdrawals by Shestakov that siphoned investor funds from the Companies in which they were invested; transfers and transactions characteristic of money laundering practices, including fragmenting assets and routing them through a complex series of transactions intended to evade surveillance thresholds and mechanisms; a series of efforts to conceal the transfers and frustrate tracing; and, ultimately, the routing of the stolen funds to a particular Bitcoin ("BTC") address controlled by Shestakov, which the Yagudayev Complaint refers to as the "Destination Wallet" (as further defined below).

14.     Yagudayev alleges that, as of the time he filed his complaint, the Destination Wallet held "~99.10 BTC continuously" from January 14, 2025 until the Complaint's August 25, 2025 filing date. Based on the closing price of BTC on January 14, 2025, the BTC held in the Destination Wallet was worth approximately $9,959,994.96 at that time.

15.     After the Yagudayev Complaint was filed, the Crypto Companies ceased producing statements regarding Fehu's investment accounts or other information regarding Plaintiffs' investments in the Crypto Companies.

16.     Plaintiffs' efforts to withdraw their investments have met with delay or outright intransigence. To date, in the aggregate, Plaintiffs still have $1.5 million that has not been recovered, $300,000 in FlexFills, belonging to Corradino; $550,000 in FF Digital, belonging to JCPE; $550,000 in Fehu, belonging to Corradino; and $100,000 in Fehu belonging to Hanley.

17.     In addition, capitalizing on Plaintiff Corradino's faith in them, Shestakov and Yagudayev each sold Corradino a digital GALA "founder's node" for $250,000 apiece — even though the GALA cryptocurrency underpinning these "assets" was already nearly worthless, and the nodes themselves therefore had practically zero value.

18.     Ultimately, none of the money that Plaintiffs invested in the Crypto Companies was used to build a viable crypto trading platform for institutional investors (as FlexFills and FF Digital had claimed was their aim) or to pursue a crypto trading strategy intended to benefit investors (as Fehu promised).

19.     Instead, some of the money went to maintaining the appearance that these companies were real, while most of the money that has not been returned, on information and belief, was looted by Shestakov, Gen. Shestakov, Migirov, Yagudayev, and the other Individual Defendants.

## THE PARTIES

20.     Plaintiff Jack V. Corradino is an individual with an address of 955 Allwood Road Clifton, County of Passaic, State of New Jersey.

21.     Plaintiff Gina Corradino Hanley is the sister of Jack Corradino. She is an individual with an address of 1078 Smith Manor Boulevard, West Orange, County of Essex, State of New Jersey.

22.     Plaintiff JCP Enterprises 1 LLC is a Wyoming limited liability company that is owned by Jack Corradino (65.75%) and two of Corradino's personal friends, Polombo (28.55%) and Charles Kohout (5.70%).

23.     Defendant German Shestakov is an individual who, upon information and belief, is a resident of the State of New Jersey. At all relevant times, he was the Chief Executive Officer of FlexFills, FF Digital, and Fehu.

6

24.     Defendant Gennadiy Shestakov is an individual who, upon information and belief, is a resident of the State of New Jersey. At all relevant times, he was the Chief Technology Officer of FlexFills, FF Digital, and Fehu.

25.     Defendant Stanislav Shestakov ("Stan. Shestakov") is an individual who, upon information and belief, is a resident of the State of Texas. At all relevant times, Stan. Shestakov held responsibilities for the development and maintenance of the Crypto Companies' technology platforms and infrastructure, and participated with Shestakov, Gen. Shestakov, Yagudayev, and Migirov in the management and execution of the Crypto Companies' schemes. Stan. Shestakov's work on behalf of the Companies included setting up and maintaining hardware located in New Jersey.

26.     Defendant Rudolf (a/k/a Ruvane) Yagudayev is an individual who resides at 1 Ardmore Place, East Brunswick, New Jersey 08816. At all relevant times, he was the Chief Operating Officer of FlexFills, FF Digital, and Fehu.

27.     Defendant Eugene Migirov is an individual who, upon information and belief, is a resident of the State of New Jersey. Migirov has held himself out as Fund Manager of Fehu, but Migirov also has held a pivotal role in the management and execution of the Crypto Companies' schemes.

28.     Defendant FlexFills LLC is a limited liability company that was originally headquartered at 111 Town Square Place, Suite 1203, Jersey City, New Jersey, 07310, and was incorporated in Delaware on or about April 29, 2021. On information and belief, FlexFills subsequently shifted its principal place of business to 10 Nassau Street, Suite 31, Princeton, New Jersey, 08542.

7

29.     Defendant FlexFills Digital Ltd. is a private limited company incorporated in the British Virgin Islands on or about May 26, 2021.  On information and belief, FF Digital's principal place of business was 10 Nassau Street, Suite 31, Princeton, New Jersey, 08542.

30.     Defendant Fehu Capital Partners LLC, f/k/a SHB Capital Partners LLC, is a foreign limited liability company headquartered at 10 Nassau Street, Suite 31, Princeton, New Jersey, 08542.

31.     Defendant Fehu Capital, LP, f/k/a SHB Capital LP, is a limited partnership incorporated in Delaware in or about 2020, headquartered at 10 Nassau Street, Suite 31, Princeton, New Jersey, 08542.

32.     Defendant Trade Flow Technologies, Inc. is a Wyoming corporation that, on information and belief, was formed for purposes of owning the intellectual property supporting the FF Digital trading platform and licensing that intellectual property to FF Digital. On information and belief, Trade Flow is headquartered at 10 Nassau Street, Suite 31, Princeton, New Jersey, 08542.

33.     Defendant Shestakov Enterprises LLC is a Wyoming limited liability company with an address of 825 Hillside Avenue, Franklin Lakes, New Jersey 07417. On information and belief, Shestakov Enterprises LLC is owned and/or controlled and is an alter ego for German Shestakov.

34.     Defendant Yehuda Capital LLC is a Wyoming limited liability company with an address of 1 Ardmore Place, East Brunswick, New Jersey 08816. On information and belief, Yehuda Capital LLC is owned and/or controlled and is an alter ego for Yagudayev.

**JURISDICTION AND VENUE**

35.     This Complaint asserts multiple causes of action arising under and pursuant to § 10(b) (*see* 15 U.S.C. § 78j(b)) and § 20(a) (*see* 15 U.S.C. § 78t(a)) of the Securities and Exchange Act of 1934, as amended (15 U.S.C. § 78a *et seq.*, the "Exchange Act").

36.     This Court has original jurisdiction over the subject matter of the claims arising under the Exchange pursuant to 28 U.S.C. § 1331 and § 27 of the Exchange Act (15 U.S.C. § 78aa).

37.     The Court has supplemental jurisdiction over the New Jersey state law claims asserted in this Complaint pursuant to 28 U.S.C. § 1367(a), because each of the state law claims asserted are so related to claims within the Court's original jurisdiction that they form part of the same case or controversy.

38.     Venue in this District is proper pursuant to 28 U.S.C. § 1391(b) because Shestakov, Gen. Shestakov, Yagudayev, and Migirov are all residents of the District; FlexFills, FF Digital, Fehu Capital, Fehu, and Trade Flow all have or had their principal places of business in the District; and substantially all of the events or omissions giving rise to the claims asserted occurred in the District.

**FACTS COMMON TO ALL COUNTS**

**A.      FlexFills and SHBC**

39.     Shestakov and his father Gen. Shestakov (together with Stan. Shestakov, the "Shestakovs"), are technologically sophisticated persons who have experimented since at least 2011 with developing strategies for making money in the financial markets, including by developing strategies and financial services that they could potentially market to others.

40.     Beginning in 2019, Yagudayev — a childhood acquaintance of Shestakov — began working with the Shestakovs in connection with an investment company called SK4 Investment Group ("SK4") that the Shestakovs and certain associates had founded.

41. Yagudayev characterizes himself in his Complaint as lacking the financial expertise necessary to evaluate the merits of SK4's investment strategies. Nevertheless, although he understood that SK4 had not been successful and had incurred financial losses by the time he joined, Yagudayev committed himself to a full-time role at SK4 in the second quarter of 2020.

42. SK4 did not succeed and was dissolved in January 2021.

43. The Yagudayev Complaint mentions that, prior to SK4's collapse, "IRS regulators" had raised concerns about SK4 due to Shestakov's having "utilized personal accounts for business transactions."

44. Shestakov's use of the companies he ran as a cache of funds for personal expenses and personal trades would occur over and over again in subsequent years. Indeed, the Crypto Companies primarily became a vehicle for funneling investor funds to the Shestakovs and Yagudayev for their respective personal uses.

45. After SK4's dissolution, the Shestakovs and Yagudayev quickly pivoted.

46. On or about April 29, 2021, the Shestakovs and Yagudayev organized FlexFills under Delaware law, initially with headquarters in Jersey City, for purposes of developing and operating a digital-asset trading platform (the "Trading Platform" or the "Platform"), i.e., a platform for trading crypto currencies and other such digital assets, that would purportedly be marketed to institutional investor clients.

47. Shortly thereafter, on or about May 26, 2021, the Shestakovs and Yagudayev organized FF Digital in the British Virgin Islands.

48. Whereas FlexFills was intended to hold and develop the intellectual property powering the crypto trading Platform, FF Digital was intended to be the regulated financial entity that would market the Platform to customers and oversee its operations.

49.     Notwithstanding this intention, according to the Yagudayev Complaint, FF Digital never executed a formal license agreement with FlexFills to establish each company's legal obligations with respect to the purported license. This is one early instance of the way in which the Individual Defendants generally ignored the corporate formalities of the various legal entities formed in connection with their scheme.

50.     After FlexFills and FF Digital were organized, the Shestakovs and Yagudayev purportedly undertook to develop simultaneously both the customer-facing Trading Platform intended to service institutional clients (these efforts being nominally associated with FlexFills, FF Digital, and later Trade Flow) and also the proprietary crypto currency trading strategies for their hedge fund (these efforts being nominally associated with Fehu Capital and Fehu). To accomplish these ambitious objectives, the Shestakovs and Yagudayev relied on themselves, a handful of associates who served sometimes as unpaid volunteers and sometimes as employees, and, eventually, outside vendors who would be involved in writing the computer code for the Platform.

51.     The Yagudayev Complaint explains that, around this time, in connection with their hedge fund plans, the Shestakovs and Yagudayev organized a limited partnership initially called SHB Capital LP ("SHBC"). The Shestakovs and Yagudayev held equity in SHBC through a company called SHB Capital Partners, LLC ("SHB Partners"), and Polombo was nominally listed as SHBC's managing director, though he played no part in managing SHBC's operations.

52.     Indeed, the Yagudayev Complaint identifies Polombo as a "victim" of Defendants' schemes.

53.     Although the Shestakovs would give Polombo titles purporting to make him legally responsible for their companies' conduct — such as managing director of SHBC — in every case,

these titles were a sham, and Polombo never possessed or exercised any managerial or other significant authority over any of the Crypto Companies or any other company affiliated with the Individual Defendants; nor did he possess accurate information about the operations or finances of the Companies.

54. Polombo did, however, perform ministerial tasks in connection with the Crypto Companies, as requested by the Shestakovs and Yagudayev, beginning in 2022.

55. Polombo began receiving a salary of $4,000 a month in 2023 and was performing similarly ministerial tasks for the Crypto Companies on an essentially full-time basis, primarily while working from home; for example, Polombo frequently completed back-office reconciliation tasks assigned to him and overseen by Migirov.

56. According to the Yagudayev Complaint, in the months following FF Digital's organization, both the technology powering the FlexFills Platform and SHBC's trading strategies were still in a developmental stage; nevertheless, to jump-start their business, the Shestakovs and Yagudayev began executing cryptocurrency trades through personal accounts using corporate funds, again ignoring corporate formalities.

57. In addition, separate and apart from the improper use of the Shestakovs' and Yagudayev's personal accounts to facilitate corporate trades, FlexFills and FF Digital also lacked internal controls or procedures to ensure adequate oversight of trades made with corporate funds.

58. The failure to create such controls and procedures at the outset would, predictably, lead to the misuse of corporate funds; but even after such disasters materialized, the Crypto Companies never took steps to implement robust controls and procedures.

59. In fact, according to the Yagudayev Complaint, Shestakov blocked their implementation to facilitate his looting of the Crypto Companies.

**B.      Corradino Begins to Invest in the Crypto Companies
as Yagudayev Discovers Shestakov's Continuing Misconduct**

60.      On or around June 7, 2022, Plaintiff Corradino made an initial investment in SHBC in the amount of $500,000.

61.      Polombo introduced Corradino to SHBC because Polombo knew Corradino had a longstanding interest in finding safe investments for the money he generated through his law practice.

62.      Polombo arranged for Corradino and Yagudayev to meet, and Yagudayev sold Corradino on the safety and promise of SHBC's trading strategies.

63.      Yagudayev made these representations to Corradino at a time when, according to his own Complaint, Yagudayev had specific knowledge (i) that the IRS had already questioned Shestakov's use of corporate funds for personal trades in connection with SK4 and (ii) Shestakov had specifically stated to Yagudayev that SHBC's proprietary trading strategies were "not ready for production."

64.      Almost immediately after SHBC accepted Corradino's investment, Yagudayev learned of new and substantial grounds for concern about the safety of any investment in FlexFills or SHBC.

65.      The Yagudayev Complaint explains that, on June 19, 2022, Yagudayev brought certain inconsistencies in the SHBC's financial records to Shestakov's attention, but that Shestakov initially succeeded in deflecting Yagudayev by providing a misleading explanation about a software glitch having caused the issue.

66.      By the end of July 2022, however, Yagudayev believed he had uncovered additional substantial losses that could not be so easily dismissed, because these losses created a liquidity crisis for FlexFills.

67. Yagudayev recounts that, during an emotional confrontation that July, Shestakov conceded responsibility for the losses but blamed a lack of internal controls, record-keeping procedures, and oversight; indeed, the Yagudayev Complaint acknowledges that FlexFills lacked "formal accounting or reconciliation procedures," and that Yagudayev's own inquiries into FlexFills's financial conditions were hampered by his inability to access "official transaction logs or substantiating documentation," which were controlled by the Shestakovs — notwithstanding that Yagudayev was FlexFills's COO.

68. As a practical matter, there were few, if any, constraints on Shestakov's ability to plunder FlexFills.

69. Apparently persuaded that Shestakov's "confession" was sincere, however, Yagudayev agreed to loan FlexFills more than $121,000 worth of cryptocurrency to resolve the liquidity crisis.

70. Yagudayev alleges that, in retrospect, the timing of SHBC's launch as a hedge fund and solicitation of money from outside investors like Corradino was linked to FlexFills's losses and liquidity issues.

71. In other words, Yagudayev — FlexFills's and SHBC's COO — concluded in August 2025, when he filed his Complaint, that SHBC's third-party investors were recruited for the purpose of covering up and continuing to fund Shestakov's fraudulent and improper trading practices.

72. The Yagudayev Complaint, however, is a self-serving document prepared for a litigation against the Shestakovs and their Companies. On information and belief, Yagudayev's claim that he only understood the connection between third-party investment in SHBC and

14

FlexFills's losses in hindsight is disingenuous, and Yagudayev understood at the time that funds raised for investment in SHBC would be used by FlexFills.

73. Regardless, in June 2022, when Yagudayev pitched SHBC as an investment to Corradino, Yagudayev had concrete knowledge of Shestakov's penchant for financial misconduct, that SHBC was devoid of internal procedures or compliance protocols, and that SHBC's trading strategy was still in development; but Yagudayev failed to disclose any of this information to Corradino.

74. Fortunately, Corradino did not lose any money in connection with his initial investment. After requesting to withdraw his investment, in November 2022, he received back both the original $500,000 investment and roughly $2,300 in profits.

75. Unfortunately, this modest success gave Corradino a misplaced sense of confidence in Defendants and later became a basis for deciding to make far more substantial investments the Crypto Companies, in reliance on the absence of any disclosures about Shestakov's misconduct and the Companies' inability to safeguard investor funds.

## C. Corradino Invests in FlexFills

76. Beginning in December 2022, Defendants accelerated their efforts to bring more outside investor capital into their Companies, beginning with an investment by Polombo.

77. Purportedly in recognition of his service to the Crypto Companies, Polombo was given a 2.0% stake in FlexFills, and he purchased an additional 3.0% stake in FlexFills for $175,000, implying a valuation for FlexFills of roughly $5.83 million.

78. Polombo's willingness to invest his own money in FlexFills, which investment he has not recovered, demonstrates his lack of knowledge about the true state of that company or the illicit practices of the Individual Defendants.

79.     Upon the closing of Polombo's purchase, Polombo relinquished his role as SHBC manager, which was assumed by Migirov.

80.     Polombo discussed his investment in FlexFills with Corradino, and Corradino expressed interest in potentially investing, too.

81.     Polombo again facilitated a conversation between Yagudayev and Corradino.

82.     Yagudayev explained that FlexFills was building a platform that could become the "Bloomberg of Crypto," exploiting an opportunity in the market to service large institutional clients seeking to trade in cryptocurrencies. He represented that the code and algorithms powering FlexFills's Platform — which were in a preliminary state of development, according to Yagudayev's Complaint — were worth "tons." Yagudayev said that the company had already had some significant meetings and was beginning to get traction, and that he expected to reach such prominence in the market that FlexFills might ultimately be snapped up by the likes of Jamie Dimon.

83.     No written prospectus or other investment solicitation materials were provided to Corradino at this time. Relying on his personal charisma and extensive experience in sales, Yagudayev succeeded in convincing Corradino on FlexFills's purportedly enormous growth potential.

84.     Believing (mistakenly) that his trusted friend, Polombo, was well positioned to vouch for FlexFills's bona fides and relying on his experience receiving a return on his SHBC investment, Corradino reasonably believed that he could credit Defendants' representations about FlexFills's prospects for phenomenal success.

16

85. Just a little over a month later, on or about January 25, 2023, Corradino executed a certain Membership Interest Purchase Agreement, pursuant to which he purchased a 5.0% interest in FlexFills for $300,000. That purchase price implied a valuation for FlexFills of $6 million.

86. Corradino's investment in FlexFills promised a return in investment without any effort on his part; he was solicited to invest and funded his investment in the United States; and FlexFills's operations were conducted in the United States, in New Jersey.

87. While Corradino certified in connection with his investment that he was an accredited investor, he was not cautioned by Yagudayev or anyone else that, among other concerns, FlexFills lacked accounting procedures, internal controls, compliance programs, or any of the myriad supporting functions that a crypto trading platform intended for use by institutional investors would need to function reliably and legally.

88. Corradino was not warned that the company was woefully undercapitalized to realize its grand ambitions.

89. Corradino was not warned about the Shestakovs' penchant for misusing corporate funds or their history of blurring the lines between personal and corporate accounts.

90. Corradino wired $300,000 to FlexFills's corporate account on January 27, 2023.

91. At the same time that Corradino was finalizing his investment in FlexFills, SHBC was restructured and rebranded as Fehu, preparatory to Fehu "officially commenc[ing] trading operations" and "initiating live fund management and client-facing activities" on April 3, 2023.

92. SHB Partners was likewise restructured and rebranded as Fehu Capital Partners, LLC ("Fehu Partners"), with Migirov serving as managing director of both Fehu and Fehu Partners.

17

**D.**     **The British Virgin Islands's VASP Act**

93.     Yagudayev alleges in his Complaint that he became aware of the BVI's Virtual Asset Service Provider ("VASP") Act of 2022 (the "VASP Act") in June 2023—roughly six months after its adoption.

94.     The VASP Act requires, among other things, the registration of BVI companies that engage in exchanging virtual assets for fiat currencies or in exchanging one form of virtual asset for another, on behalf of another person.

95.     Under the VASP Act, any BVI VASP that failed to apply for registration before July 31, 2023 would be deemed to be operating in violation of the law.

96.     Failure to register would have been fatal to FF Digital's ability to operate and would therefore have diminished the value of FlexFills's intellectual property in the near term, assuming such intellectual property had any intrinsic value to begin with.

97.     It is emblematic of the near non-existent regulatory and control environment characterizing Defendants' operations that FF Digital's Chief Operating Officer did not learn about critical legislation bearing directly on FF Digital's ability to operate until some six months after the law was adopted, and only just before the July 31, 2023 deadline to apply for registration.

98.     Having scrambled to submit the required registration application for FF Digital and to otherwise come into provisional compliance with the VASP Act, in or around July 2023, the individual defendants initiated a reorganization of their equity interests in FlexFills, such that two Wyoming-registered holding companies, Shestakov Enterprises LLC (owned in equal part by Shestakov, Gennadiy Shestakov, and Stanislav Shestakov) and Yehuda Capital LLC (owned by Yagudayev and Yakhin Yagudayev, Yagudayev's brother), came to hold the Shestakovs' and the Yagudayevs' respective interests in FlexFills.

18

99.   On or around July 18, 2023, Shestakov and Yagudayev also incorporated Trade Flow Technologies Inc. ("Trade Flow") in Wyoming, listing headquarters at 10 Nassau Street, Suite 31, in Princeton, New Jersey, ostensibly to hold legal title to FlexFills's intellectual property and to license such property to FF Digital.

100.   In accordance with this reorganization, the FlexFills investors, for a nominal price, were given interests in Trade Flow that mirrored their respective interests in FlexFills.

101.   According to the Yagudayev Complaint, however, although FF Digital began making "licensing payments" to Trade Flow in March 2024, ownership of FlexFills's intellectual property was never transferred to Trade Flow, nor is there any mention in the Yagudayev Complaint of a license agreement pursuant to which such payments were made.

102.   The failure to observe these corporate formalities is consistent with, as described below, Defendants' free use of funds invested in one of the Crypto Companies for the benefit of other Crypto Companies.

### E.   Corradino Invests in FF Digital

103.   In the summer of 2023, the Individual Defendants and/or the Crypto Companies were apparently beginning to run short of funds again and needed a fresh infusion of capital.

104.   They approached Migirov and also Corradino and Polombo.

105.   According to the Yagudayev Complaint, Migirov pledged in June 2023 to invest a total of $800,000 in FF Digital and Trade Flow — $300,000 for a 5% equity stake in Trade Flow, implying a $6 million valuation for a company that had no assets whatsoever, and $500,000 for a 5% equity stake in FF Digital, implying a $10 million valuation for a company operating an unready and untested Platform with a de minimis number of users other than Defendants themselves.

106. On behalf of a company called Migirov Ltd., Migirov executed an FF Digital Subscription Agreement and a separate FF Digital Shareholder Agreement on or about July 31, 2023.

107. Around this same time, Yagudayev also solicited Corradino and Polombo to invest in FF Digital.

108. Because Yagudayev and the Individual Defendants operated as if the Crypto Companies were divisions of a single company, Yagudayev made the same pitch to Corradino and Polombo that he had made regarding FlexFills — the Individual Defendants were careful and judicious stewards of investor funds, but more money was needed to capitalize on the stunning opportunity to interest institutional investors in FlexFills technology through FF Digital. Yagudayev did not disclose the litany of internal control issues, known misconduct, and operational challenges that made FF Digital virtually certain to fail.

109. Corradino, Polombo, and a third investor formed JCP Enterprises 1 LLC ("JCPE"), a Wyoming limited liability company, for the purpose of investing in FF Digital, in July 2023. JCPE is nearly 66%-owned by Corradino and nearly 29% owned by Polombo, with a third investor owning the remaining amount, between 5% and 6%.

110. On or about July 31, 2023, JCPE signed the same FF Digital Shareholder Agreement that Migirov had signed on behalf of Migirov Ltd., preparatory to a $550,000 investment that would be funded on or around December 17, 2023.

111. The Yagudayev Complaint alleges that Migirov stalled in fulfilling his commitments and that, after serial delays, he eventually reneged in September 2023.

112. Unlike Polombo, Migirov was trusted by the Shestakovs with access to information regarding the true state of the Companies, and his decision not to invest his own money is telling.

113. Although Yagudayev specifically alleges that Migirov had intended to invest in **Trade Flow** and **FF Digital**, he also specifically alleges that "[b]y late August 2023, **FlexFills** encountered acute liquidity constraints" resulting from Migirov's delay; that, to "maintain . . . operational liquidity, **FlexFills** obtained emergency short-term personal loans"; that "**FlexFills** raised funds through . . . emergency bridge borrowings"; that Migirov's reneging "significantly disrupted **FlexFills'** capital planning, triggering immediate liquidity challenges and necessitating emergency financial actions"; and that "[i]n direct response to the shortfall created by Migirov's defaulted investment, **FlexFills** temporarily operated on internal margin, utilizing approximately USD 50,000 of company funds to cover . . . operating expenses."

114. In other words, the Chief Operating Officer of FlexFills, FF Digital, and Trade Flow makes crystal clear that Defendants' intention had been to use the $800,000 from Migirov's pledged investment in FF Digital and Trade Flow to stabilize FlexFills's financial crisis.

115. Moreover, when Yagudayev writes that FlexFills began to operate "on internal margin," cannibalizing $50,000 "of company funds to cover critical operating expenses," on information and belief, he is stating in veiled language that Defendants improperly borrowed Crypto Company client funds—since there was no other corporate cash to be had.

116. Indeed, in connection with the decision to operate on "internal margin," Yagudayev goes on to explain that "FlexFills' leadership . . . personally guarantee[d] the margin exposure" and that "[h]istorically, FlexFills had established a customary practice whereby founders' personal assurances within logical reason were treated as adequate governance authorization for financial decisions, even absent formal corporate resolutions or explicit internal policies."

117. The fact that the Crypto Companies leadership freely utilized funds invested in one company for the benefit of another, or that it condoned its members raiding client funds to cover

operating expenses based only on their own "personal assurances" to "guarantee" such arrangements, were never disclosed to Plaintiffs in connection with any of the investments made in the Crypto Companies.

118. FlexFills's financial distress only deepened in the fall of 2023. In October, four of the company's development team members agreed to work for six months without compensation, according to the Yagudayev Complaint.

119. But in December 2023, Defendants ensured the Crypto Companies' financial "stabilization" by persuading Corradino and Polombo to fund JCPE's investment in FF Digital, with JCPE purchasing a 5% stake for $550,000.

120. In the weeks before the investment was funded, Yagudayev continued to present the opportunity to invest in FF Digital as the opportunity to get in on the ground floor of a cryptocurrency trading platform that would capture a lucrative and underserved institutional investor market. FlexFills, according to Yagudayev, was thus poised to enjoy stratospheric success.

121. Although, as with the prior FlexFills investment, Corradino was given no written investment materials in connection with the Individual Defendants' solicitation of his investment; shortly after the JPCE investment in FlexFills was made, Yagudayev completed a 2024 business plan (the "FlexFills Business Plan") for use in soliciting $5 million from other investors. The FlexFills Business Plan exhibits the same breathless enthusiasm for FF Digital that Yagudayev employed when speaking to Corradino:

122. The "FlexFills Business Plan: Billenial [*sic*] Investment Forecast" identifies Yagudayev as author and lists FF Digital in the lower right hand corner as the name of the business (notwithstanding the title of the Business Plan), along with a BVI address. Similarly, a

capitalization table at the back of the Plan provides information for FF Digital, not the FlexFills company.

123.    On information and belief, Defendants at this time were using FlexFills as a trade name for the combined operations of FF Digital and Trade Flow: "the proposed $5 million investment is structured to encompass intellectual property. FlexFills Digital Ltd. and TFT [Trade Flow]." On information and belief, the Individual Defendants intended for Trade Flow to replace FlexFills as owner of the intellectual property that would purportedly power FF Digital, but FlexFills and Trade Flow never completed the documentation required to accomplish that aim and were treated as indistinguishable by the Individual Defendants, despite their purportedly separate corporate existences and despite the fact that Corradino had invested hundreds of thousands of dollars in the company FlexFills that the Individual Defendants now intended to use merely as a trade name.

124.    Beginning on the bottom of the Plan's first page of text, the Plan presents the same lofty vision for FlexFills that was sold to Corradino:

> This is . . . why we're raising $5 million— a step towards the vision, a chance for investors to join us at a moment when risk is tempered by achievement. FlexFills offers more than just potential . . . . Assembling a committed team, securing a client base, and establishing a clear market fit – are challenges we have successfully navigated. ***FlexFills stands on the forefront with disruptive technology that is going to reshape the industry and gain significant market share because the offering is simply better.*** Our assertions are not merely based on optimistic projections or personal assurances. . . .
>
> The business plan centers on a careful allocation of resources towards strategic market expansion and product development that captures our goals and strategic direction. As we seek to raise $5 million, every dollar is meticulously allocated . . . . At FlexFills, we're firm believers in the synergy of collaboration, channeling our hearts and minds into making wise investments that look ahead, aiming to create positive outcomes for everyone involved. [*sic passim*; emphasis in original]

125.    As the foregoing allegations demonstrate, none of the claims about "a careful allocation of resources," a "strategic market expansion and product development," "every dollar"

23

being "meticulously allocated," or "wise investments" were true — much less the promise that FlexFills was going to "reshape the [cryptocurrency] industry and gain significant market share because the offering was simply better."

126.    Yet Yagudayev's insistence on FF Digital as an investment opportunity that paired reliability with the promise of stratospheric success is underscored graphically in the Business Plan with an image of a star-like ball of light taking off and rising up above the lines and bars of financial graphs and tables. This image appears directly beneath the Business Plan excerpts quoted in ¶ 124 *supra*:



127.    The "Partnership and Vision" statement presented alongside the FF Digital and Trade Flow capitalization table at the end of the Plan is equally sanguine: "Investing in FlexFills transcends traditional equity stakes; it is an opportunity to partner with a visionary company poised to help redefine the fintech landscape. Investors will be at the forefront of this transformation, contributing to and benefiting from FlexFills' pursuit of excellence, innovation, and strategic market expansion." None of this was true.

128.    The Business Plan also made patently false claims about the present state of the FF Digital Platform:  "integration of market access, data, and trading tools sets it apart in the executions industry. ***Its offerings have become essential to financial professionals' daily operations, creating high entry barriers for competitors*** (emphasis added)."

24

129.   But these were the promises that Yagudayev made to Corradino orally and repeatedly in the weeks prior to December 17, 2023 to induce Corradino and Polombo to invest through JCPE in FF Digital.

130.   Polombo had no reason to warn Corradino about the falsity such claims and promises, because the Individual Defendants had succeeded in deceiving him over a long period of time. As Yagudayev wrote in his complaint, Polombo was a victim of Defendants' scheme.

131.   The statements Yagudayev made to Corradino and Polombo about the development of the Platform, its market penetration, and FF Digital's prospects, all made for the purposes of inducing them to invest JCPE funds in FF Digital, were false and known to be false when made.

132.   On the strength of Yagudayev's representations to Corradino and Polombo, on or about December 17, 2023, Shestakov and Yagudayev persuaded JCPE to invest $550,000 in FF Digital. JCPE's investment implied an $11 million valuation for FF Digital.

133.   The JCPE members' reliance on Yagudayev's representations was reasonable in light of the fact that Polombo had been manipulated and deceived into believing that FF Digital was a legitimate company with exceptional prospects, because Corradino trusted Polombo as a purported expert on FF Digital's operations, and because Corradino and Polombo knew that Corradino had previously been able to withdraw his funds from SHBC without difficulty and had even earned a modest profit.

134.   JCPE's investment was made pursuant to a Shareholder Agreement, and JCPE was not expected or required to do any work in connection with its investment.

135.   The solicitation of and payment for the investment occurred in the United States, and FF Digital, although organized as a BVI company and also possessing a BVI address, was operated from the United States, in New Jersey.

136. Shestakov and Yagudayev intended from the outset to use the $550,000 from JPCE for the express, and improper, purpose of paying down FlexFills debts.

137. The Yagudayev Complaint is explicit that this is how the money was used: "By late December 2023, following receipt of JCP['s] investment, FlexFills successfully cleared all outstanding bridge loans, internal margin liabilities, and external financial liabilities."

138. But while paying FlexFills's outstanding obligations may have given Shestakov and Yagudayev breathing room in the near-term, merely getting back to zero would hardly suffice to fund the Crypto Companies' purported growth strategy, much less satisfy Shestakov's ambitions to use investor funds to fuel his personal financial ambitions.

**F.      Yagudayev Rolls Out a $5 Million Investor Solicitation
Even as He Discovers More Malfeasance by Shestakov**

139. Accordingly, in "January 2024, with the aid of their Business Plan, Shestakov and Yagudayev commenced preparations for a Series A fundraising initiative," which the Yagudayev Complaint characterized as "a comprehensive strategy for a larger capital raise, aiming to accelerate growth objectives."

140. Simultaneously, though, in January 2024, Yagudayev had once again discovered "material discrepancies between reported account balances and actual asset holdings across FlexFills' exchange accounts."

141. Despite this alarming discovery, on February 6, 2024, FF Digital entered into an Equity Financing Agreement with a certain Alex Zhuang, which was structured to compensate Zhuang with a 2.5% equity stake in both FF Digital and Trade Flow after he raised $5 million from investors.

142. The Yagudayev Complaint alleges that, after signing the agreement, Zhuang informed Defendants that the FF Digital's "existing user interface and website required significant redesign to meet institutional investor expectations."

143. Zhuang's independent assessment flatly contradicts Yagudayev's assertions in the Business Plan and in the same representations that he made to Corradino and Polombo before JCPE's investment.

144. Beginning in February 2024, Defendants engaged "an independent design studio" to perform this overhaul—a project that would take more than seven months.

145. Simultaneously (and for reasons that remain unclear), the Individual Defendants continued to pursue the substitution of Trade Flow for FlexFills, though the Yagudayev Complaint acknowledges that FlexFills failed to execute a draft asset purchase agreement intended to transfer ownership of FlexFills's intellectual property to Trade Flow.

146. The Yagudayev Complaint also claims that FlexFills "licensed" its intellectual property to FF Digital "through Trade Flow," and that FF Digital began making licensing payments to Trade Flow in March 2024. This improvised arrangement is inconsistent with the notion that FlexFills and Trade Flow were separate companies, since Trade Flow was being paid for intellectual property owned by FlexFills. Moreover, it is unknown how much Trade Flow purportedly received from FF Digital or what happened to those "licensing" fees.

147. As of February 1, 2024, JCPE had acquired 411,700 shares of Trade Flow stock for the nominal price of $8.23, giving JCPE ownership of 8.2% of the Trade Flow shares then issued.

**G.    Yagudayev Develops "Serious Concerns"
About the FlexFills Platform's "Operational Integrity"**

148. According to the Yagudayev Complaint, while Defendants were attempting to remediate their platform interface in accordance with Zhuang's guidance, Yagudayev learned that

27

the integrity of the FlexFills Platform was compromised and that the absence of internal controls had once again left corporate funds exposed to misappropriation by the Shestakovs.

149.    Yagudayev alleges that, after finding "material discrepancies" in connection with trading activity that took place in January 2024, on February 17, 2024, he suspended such activity while he investigated what had happened.

150.    Yagudayev, according to his Complaint, found that the FlexFills Platform's Exchange APIs [application programming interfaces] — protocols and tools that enable FlexFills software to interact with other cryptocurrency exchange platforms — failed to record FlexFills's account balances in real time, as should have occurred.

151.    The APIs were thus incapable of identifying the "significant discrepancies" Yagudayev had found.

152.    Based on this discovery, Yagudayev purportedly developed "serious concerns regarding system integrity."

153.    On February 18, 2024, and in the days that followed, Yagudayev asserts that "[a]dditional discrepancies emerged across multiple trading venues, suggesting synchronization failures between exchange APIs and FlexFills' systems."

154.    According to his Complaint, because of the "ongoing data integrity issues and lack of reliable internal financial records," Yagudayev initially calculated on the 18th that FlexFills's "ending balance" was $371,400.95. (Yagudayev does not define what he means by "[FlexFills's] ending balance.")

155.    Upon a second look, though, Yagudayev lost confidence in that figure and revised those balances downward, first to $202,000.00, and then again to $188.262.91. The Yagudayev Complaint does not indicate Yagudayev's degree of confidence in this third balance figure.

156. Yagudayev calculated that the discrepancies he identified translated to over $300,000 in losses and found that that money had improperly been misappropriated from the amounts invested by JCPE in FF Digital.

157. Later on February 18, 2024, Yagudayev purportedly confronted Shestakov about these discrepancies and Shestakov's repeated failure to complete net asset value ("NAV") calculations for Fehu, which calculations were supposed to be based on internal trading logs.

158. Shestakov, according to the Yagudayev Complaint, conceded that he had lied to Yagudayev about "critical operational information" and had "concealed off-system trading activity," which Yagudayev understood to have caused the substantial losses.

159. By this time in February 2024, having once again caught Shestakov red-handed, Yagudayev knew (i) that Shestakov had received warnings from the IRS in connection with the misuse of SK4 client funds in or around 2021; (ii) that, in 2022, Shestakov had previously blamed his improper trading with SHBC-held assets on a lack of internal controls and he was now invoking the same excuse again in 2024; (iii) that the SHBC losses caused by Shestakov in 2022 had been substantial and that losses from his latest malfeasance exceeded $300,000; (iv) that apparently nothing had been done to remediate the absence of effective policies or internal controls since the 2022 losses were discovered; (v) that Yagudayev had just found FlexFills's trading systems to lack integrity and to have been ineffective for purposes of monitoring transactions and identifying discrepancies; (vi) that Yagudayev knew Shestakov and his family possessed "exclusive administrative access to FlexFills'[s] databases, backend infrastructure and codebase"; and (vii) that Defendants decided as a group on February 20 *not* to undertake any internal investigation, audit, or remediation plan.

160.    Notwithstanding all of these bright red flags, and notwithstanding Yagudayev's responsibilities as Chief Operating Officer for FlexFills, Fehu, FF Digital, Trade Flow, and the other Crypto Companies, Yagudayev *still* chose not to disclose to investors or alert regulators about Shestakov's egregious misconduct, about the financial condition of the Crypto Companies, or about the absence of internal controls, compliance policies, accounting policies, or any other hallmarks of a bona fide financial institution — much less about the dismal state of the Platform itself.

161.    On information and belief, Yagudayev had no reasonable basis to think that Shestakov's conduct would not continue.

162.    Indeed, Yagudayev alleges that just a few days later, on February 26, 2024, he "discovered unauthorized and undocumented transfers to [a certain] Aureas Finance subaccount . . . by Defendant Shestakov without internal system records or formal approval," and that, on February 27, 2024, he identified further "substantial discrepancies in the HTX subaccount, which held balances far exceeding established internal limits for a monitoring pilot."

163.    Apparently attempting to demonstrate in his Complaint that he was acting responsibly with respect to his obligations as COO, Yagudayev alleges in detail that he confronted Shestakov over the seriousness of his misconduct and the risks to the Crypto Companies such conduct posed.

164.    But the Yagudayev Complaint makes clear that Shestakov attempted to minimize and deflect Yagudayev's concerns, that he dissembled, that he refused to take accountability, and that Yagudayev *still*, *yet again*, failed to raise the alarm.

165.    Further underscoring the depth of Shestakov's misconduct, lack of accountability, and lack of trustworthiness, Yagudayev also discovered before the end of February that Shestakov

had ***deleted*** "critical messages containing sensitive operational information," and Shestakov eventually admitted to Yagudayev that he had done so.

166.    In or around March 2024, Yagudayev relates that he drafted and redrafted a series of operations and policy documents, purportedly to begin to remediate the Crypto Companies' non-existent controls and compliance functions; but, according to Yagudayev, Shestakov either dismissed these documents out of hand or ignored them, such that Defendants "failed to establish systematic controls or robust audit trails, leaving critical vulnerabilities unaddressed."

167.    The Yagudayev Complaint details the types of policies that Shestakov refused to consider, all of which are foundational to operating a legal and compliant financial services platform, including a Client Ledger System establishing the categories of information to be captured in connection with client transactions; protocols for managing various types of accounts utilized by the Crypto Companies; an anti-money laundering compliance manual; know-your-customer documentation procedures; and procedures for onboarding and verifying accredited investors.

168.    Yagudayev is clear that the Shestakovs "fail[ed] to execute any of the Plaintiff's documented business requirements and policy recommendations."

169.    The Shestakovs' flat refusal to adopt — or even consider — a procedural framework to safeguard the Crypto Companies or the investor and client funds they managed obviously signaled their intention to continue with the type of misconduct that was certain to cause the Crypto Companies to collapse.

170.    As set forth in the Yagudayev Complaint, apart from Yagudayev's having remonstrated with the Shestakovs privately and drafted policies that were not adopted, the only

31

concrete step he took to safeguard client and investor funds was to suspend FlexFills's trading operations as of February 17.

171.   But despite Shestakov's having refused to consider the adoption of necessary procedures or to permit Yagudayev to remediate the conditions that had allowed Shestakov to divert investor and client funds from the Crypto Companies, Yagudayev apparently permitted trading to resume sometime in March 2024.

172.   Moreover, inexcusably, Yagudayev pressed ahead with bringing more investor cash into the Crypto Companies.

## H.   Corradino Makes a Series of Substantial Investments in Fehu

173.   On April 17, 2024, Corradino wired $1 million from his account at Valley Bank to Fehu.

174.   In the weeks prior to Corradino's having made this investment, Yagudayev presented Fehu as utilizing arbitrage strategies based on short-term price differentials in cryptocurrencies offered on different platforms, and gave Corradino to understand that safe and reliable returns of 30% could reasonably be expected. Yagudayev stated to Corradino that the nature of the arbitrage strategy, though complicated to execute, limited investor risk.

175.   Yagudayev did not warn Corradino — and Polombo was unaware — of the turmoil threatening the Crypto Companies' operations, that Fehu did not have proven algorithms or strategies for executing their arbitrage strategy or that Fehu's strategy was still under development, that Fehu did not have policies or procedures necessary for regulatory compliance in connection with the handling of investor funds, or that the hedge fund's CEO had, on multiple occasions, misappropriated funds for personal trading and utilized money belonging to one company for the debts and expenses of a different company, among other clear and significant investment risks.

32

176. Instead, Corradino continued to add to his investment, based on the conviction Yagudayev had cultivated in Corradino as to the Individual Defendants' integrity and the belief thatthat Fehu's safe and reliable trading strategy could generate the promised returns.

177. On April 29, 2024, Corradino wired $0.5 million from his account at Valley Bank to Fehu, bringing his total investment in Fehu to $1.5 million.

178. On June 6, 2024, Corradino wired $0.75 million from his account at Valley Bank to Fehu, bringing his total investment in Fehu to $2.25 million.

179. Even as Plaintiff Corradino continued to augment his investments in Fehu, Yagudayev was learning from FF Digital's external auditors about further impropriety that threatened FF Digital's ability to comply with the VASP Act and therefore its ability to operate at all.

180. The VASP Act requires registered VASPs to have their financial statements audited and filed with the BVI's Financial Services Commission (the "FSC").

181. It also requires VASPs to maintain records adequate to explain transactions, to accurately determine financial positions, and to facilitate audits, and that the audit process must include an assessment of the VASP's compliance with AML and CFT [Countering the Financing of Terrorism] requirements.

182. The Yagudayev Complaint alleges that, in the second quarter of 2024, external auditors conducted an audit of FlexFills Digital for fiscal year ending 2023.

183. On information and belief, the Shestakovs consented to the audit of FlexFills Digital because the VASP Act left them no choice.

184. The auditors found that a Binance account, which used a FlexFills corporate email address and which Shestakov had previously represented to Yagudayev was a FlexFills account, was an account held by Shestakov personally.

185. The auditors also "formally warned FlexFills regarding serious violations of asset-segregation protocols and inappropriate commingling of corporate and personal funds."

186. Ultimately, neither FF Digital nor any other Crypto Company would succeed in being registered as a BVI VASP, and none is currently listed as a registered VASP on the BVI's Financial Services Commission website. *See* https://www.bvifsc.vg/regulated-entities-vasp (last visited July 6, 2025).

187. According to Yagudayev, when he once again confronted Shestakov about his use of a personal account masquerading as a corporate account, Shestakov replied, "I thought you were on board with this."

188. Shestakov's response could not have left Yagudayev with any doubt whatsoever about Shestakov's culpable and deliberate misuse of company and investor funds for his own benefit and his own ongoing culpability in facilitating that misconduct through his inaction. It further made clear that non-action by Yagudayev would be interpreted by Shestakov as approval.

189. Still, Yagudayev failed to alert regulators or any of the Crypto Companies' investors or clients regarding Shestakov's clear intention to continue stealing from the Companies.

190. Moreover, Yagudayev alleges that, from April to September 2024, amidst recriminations with the Shestakovs about monthly salary draws and "agreed upon" money transfers by Yagudayev for his personal "living expenses," Shestakov and his father, Gennadiy, sidelined FlexFills's chief financial officer — who was not part of the Shestakovs' inner circle —

and assigned Yagudayev certain internal review projects as a "distraction," purportedly to keep Yagudayev from "investigat[ing] emerging suspicions of financial misconduct effectively."

191. Yagudayev's protestations that suspicions of financial misconduct were only now emerging are not credible, though Yagudayev would later discover he had far more to learn about the extent of the Shestakovs' scheme and their theft.

192. During this period, Yagudayev alleges that he learned his own capital contributions to the various Crypto Companies had not been recorded, and he found that Shestakov was now reluctant to acknowledge those contributions.

193. According to Yagudayev's Complaint, between "May and July 2024," he negotiated unsuccessfully with Shestakov for recognition or repayment of these contributions.

194. Yet again, Yagudayev failed to warn investors about Shestakov's undeniable malfeasance and failed to intervene as Plaintiff Corradino continued to invest.

195. On July 11, 2024, Corradino wired another $0.7 million from his account at Valley Bank to Fehu, bringing his total investment in in that company to $2.95 million.

196. Then on August 19, 2024, Corradino wired $250,000 to Shestakov personally and $250,000 to Yagudayev personally, to purchase certain cryptocurrency-related assets, referred to as "nodes," that were created by Gala Games in connection with its GALA cryptocurrency.

197. A "node" is a term that refers to a computer connected to the blockchain that verifies cryptocurrency transactions for a particular crypto currency so that the transactions can be recorded on the public blockchain ledger.

198. As used in connection with the digital assets sold by Yagudayev and Shestakov to Corradino, the term "nodes" refers metonymically to an entitlement to fees earned by the computers doing this digital verification work.

35

199.    Shestakov and Yagudayev induced Corradino to buy the nodes based on representations that the nodes would generate a sustainable revenue stream worth far more than the sales price Corradino was being charged. They told Corradino that he was only paying 40% of the nodes' true value and further induced Corradino to buy the nodes because they claimed that they intended to invest the proceeds of the sale in the Crypto Companies.

200.    The nodes sold to Corradino by Yagudayev and Shestakov for $500,000 were worthless and known to be worthless at the time they were sold.

201.    Together with the $300,000 that Corradino had invested in FlexFills in early 2023 and the $500,000 wired to Shestakov and Yagudayev individually for the nodes, Corradino had now entrusted Defendants with $3.75 million of his own money, and JCPE had invested an additional $0.55 million in FF Digital.

202.    According to his Complaint, Yagudayev had been on a personal trip that began on August 14, 2024 when Corradino's August 19 wires were sent.

203.    Shortly after Yagudayev returned from his travels on August 20, 2024, according to his Complaint, he discovered additional "substantial discrepancies" in the Crypto Companies' transaction records, which he identified "visually, . . . by reviewing exchange balances manually."

204.    The FlexFills Platform had once again failed to catch these "substantial discrepancies," and there were no internal safeguards or controls in place to catch them otherwise.

205.    On August 31, 2024, according to Yagudayev, Fehu "recorded its largest monthly loss to date, with a Year-to-Date return . . . of -6.82%," as compared with a purported 13.32% year-to-date return, on paper at least, as of the end of February 2024.

206.    On information and belief, Migirov had been the Fund Manager of Fehu since SHBC became Fehu in 2022. On information and belief, Migirov must have known that Shestakov

was misappropriating Fehu investor funds for personal trades — publicly available records show that, from May 2023 to October 2023, Fehu's total net asset value (NAV) ranged between $490,121 and $538,245 (*see* https://Fehu.com/fund-performance-report-10-01-2023/ (last visited July 6, 2026)). It is therefore implausible that the disappearance of hundreds of thousands of dollars from Fehu's accounts, which Yagudayev discovered in the first half of 2024, could not have escaped notice.

## I.    Yagudayev and Shestakov Have a Permanent Falling Out

207.    Following events in August, according to the Yagudayev Complaint, relationships between Yagudayev and the Shestakov entered a period of terminal decline, characterized by mutual recriminations and allegations by each that the other's misconduct was causing the Crypto Companies to fail.

208.    Meanwhile, Yagudayev alleges, in November 2024, the Shestakovs also failed to pursue — and to make the operational changes to FF Digital that would have been required to pursue — two potential investors with significant assets who were based in Asia and who had been introduced to the Crypto Companies by Alex Zhuang.

209.    Yagudayev alleges that one of the quantitative trading firms, Trade Terminal, was prepared to invest up to $20 million in a "performance-based fee-sharing arrangement[], contingent upon successful validation of FlexFills' [*sic*] algorithmic trading strategies," and that a second potential investor, Zero Division, was prepared to invest up to $10 million through a similar arrangement.

210.    The Shestakovs plainly did not wish to invite the kind of scrutiny that a validation test of their "trading strategies," or that $30 million in investments from serious industry participants, would inevitably bring; and thus Zhuang was ignored by the Shestakovs.

37

211. Despite the internal conflicts that were threatening to destabilize the Crypto Company scheme, with respect to Corradino, the Individual Defendants managed to maintain the façade that the Companies were functioning as intended. Corradino received regular statements from Fehu purporting to show the growth of his investment.

212. Indeed, Corradino had such conviction in the opportunity presented by the Crypto Companies that he interested his sister Hanley in an investment in the same Fehu investment fund into which he had invested extensively.

213. On March 20, 2025, Fehu accepted $400,000 for investment by Hanley.

214. Fehu accepted the investment without disclosing to Hanley that Fehu did not have proven algorithms or strategies for executing the fund's purported arbitrage strategy, that Fehu did not have policies or procedures necessary for regulatory compliance in connection with the handling of investor funds, or that the hedge fund's CEO had, on multiple occasions, misappropriated Fehu funds for personal trading and for the payment of the debts and expenses of other Crypto Companies. Fehu also failed to disclose to Hanley that the fund was being managed from a digital platform that was not properly licensed to operate in BVI or that relations among the owners and officers of the fund had become so acrimonious that Fehu operations were experiencing or on the point of experiencing substantial disruption.

215. On May 25, 2025, the relationships between the Shestakovs and Yagudayev having failed to improve, Yagudayev discovered that his login credentials for the FlexFills system had been invalidated and, the following day, that his work computer had been taken by the Shestakovs.

216. Yagudayev requested redemption of his holdings in Fehu on May 28, 2025. Astonishingly, when that did not occur — as detailed in the Yagudayev Complaint — Yagudayev tried to sell his stakes in the various Crypto Companies to a third party, despite knowing that the

38

Shestakovs were thoroughly corrupt and that the Crypto Companies' operations were rife with misconduct and illegality.

217. On June 4, 2025, Yagudayev alleges, company access and credentials for FF Digital CFO Margo Ayrapetyan were also revoked without notice, explanation, or cause.

218. Apparently having decided that the breakdown in his relationship with the Shestakovs was permanent, Yagudayev began to investigate what had happened to the Crypto Companies' money in detail.

219. It is noteworthy that, notwithstanding that Yagudayev had been an officer of the various of the Crypto Companies for years and that he had caught Shestakov engaging in misconduct on multiple occasions, he only initiated a thorough investigation after he himself was frozen out and believed that he had personally suffered financial losses.

220. In his complaint, Yagudayev's description of his investigation into the Crypto Companies' crypto transactions runs to some 639 paragraphs in length, exclusive of voluminous supplemental exhibits.

221. Using specialized forensic tools that he acquired for the purpose of his investigation, Yagudayev followed the movement of crypto in and out of wallets associated with the Crypto Companies on the blockchain — the publicly visible leger where the transactions are recorded.

222. Yagudayev identified "theft and fraudulent activity" dating back to the fourth quarter of 2021.

223. According to Yagudayev's analysis, Shestakov — on information and belief, for the benefit of himself, Gen. Shestakov, Stan. Shestakov, and Migirov, and with their knowledge and assistance — carried out a coordinated scheme to siphon Crypto Company assets and client

moneys into wallets that Shestakov controlled. Shestakov then ran these misappropriated assets through a baroque series of obfuscatory transfers to conceal what had been done and to complicate tracing, ultimately parking the proceeds in an off-books holding wallet.

224.    For example, Shestakov created a wallet that he caused to be identified in the Crypto Currencies' systems as a "whitelisted" withdrawal path — i.e., an address pre-approved for purposes of transferring cryptocurrency funds — and then caused company Bitcoin transfers to be made to this wallet in a manner that would falsely appear to casual inspection as if it were routine company trading activity.

225.    But this wallet did not hold assets for operations; it forwarded incoming Bitcoin within hours through a bewildering series of splits and transfers before the Bitcoin was ultimately aggregated in a final wallet. Such series of transfers are classic laundering behavior.

226.    Yagudayev's analyses, for example, identified one "transit" wallet utilized for laundering purposes by Shestakov as showing five inflows and five outflows, with funds always being forwarded within one to four hours, and the wallet always maintaining a zero balance otherwise. This account and these transfers bear the hallmarks of a pass-through address created to disguise origin rather than to store or use assets.

227.    Yagudayev's analyses further show that large transfers of Bitcoin into transit wallets, transfers of 9.97 BTC and 5.949 BTC respectively, were synchronous with Crypto Company financial shortfalls. Since Shestakov's personal financial resources cannot explain the movement of nearly half a million dollars' worth of Bitcoin, Yagudayev concluded — correctly, Plaintiffs believe — that these transfers represent the misappropriation of company and/or investor funds.

228.    Yagudayev found that company and/or investor funds were routinely cycled through major exchanges, especially Binance and Deribit, split into many smaller pieces, and even sent funneled back through the same exchanges again. These "loopback" transfers have no legitimate business purpose and correspond to layering techniques typically used to hide the source and control of funds.

229.    According to Yadudayev's analysis, the Shestakovs and Migirov also exploited Fireblocks "vault-to-vault" transfers by embedding small external payments inside transactions that looked like routine internal transfers, so aggregate balances seemed to reconcile even as these external payments were leaked out to outside wallets.

230.    The Shestakovs and Migirov also concealed thefts by automating many small withdrawals and clustering activity in late-day hours to avoid transfer alerts and human review.

231.    Off of the block chain, the Shestakovs and Migirov falsified the Crypto Companies' corporate records — for example, in the software purportedly used to perform reconciliations, they overwrote automated formulas to force records into balance and backdated fake "corrective trades" to conceal shortfalls.

232.    These are only some of the highly sophisticated, technical, and coordinated means that the Shestakovs and Migirov used to accomplish and conceal their theft.

233.    Ultimately, Yaguayev traced all of these illicit transfers to a single "parking" address — bc1qldeurx7eg9c60fkmvedkce4arss2jp9dy3vm9q (the "Destination Wallet") — which received eight deposits totaling about 99.10 BTC over six days. The assets in this wallet had not been moved further as of the date that the Yagudayev Complaint was filed, and an attorney for Yagudayev confirmed via email that, as of February 5, 2026, the Bitcoin in the Destination Wallet still had not been transferred.

234. The value in dollars of the Final Wallet's BTC was roughly $10.43 million as of the Yagudayev Complaint's filing (the value of one Bitcoin having ranged from just over $119,000 per coin ten days before the Complaint was filed to just over $113,000 on the date of filing). The value of that same quantity of BTC has fallen to roughly $6.32 million since that time, based on a coin value of $63,746.55 at around 2:30 p.m. EST on Monday, July 6, 2026.

235. Unbeknownst to Corradino or JCPE, after completing his investigation, Yagudayev filed his Complaint in the Chancery Division of the Bergen County Superior Court on August 26, 2025.

**J.      Corradino and Polombo Ultimately Discover the Fraud**

236. In or around April 2025, Polombo discovered that Yagudayev had been placing cryptocurrency trades through an account held in Polombo's name.

237. Yagudayev made excuses for his conduct, but in fact Yagudayev was using an account held in Polombo's name to shield his own misconduct from discovery.

238. In subsequent months, the transmission of Fehu account statements became irregular and delinquent.

239. Corradino and Polombo discussed their concerns amongst themselves and with the Shestakovs and Yagudayev, but Corradino was placated by their attribution of these issues to the fledgling state of the Crypto Companies.

240. Moreover, Corradino had been able to withdraw $500,000 from Fehu account in March 2025. Corradino was similarly able to withdraw an additional $1 million in July 2025.

241. Eventually, however, the Yagudayev Complaint filed in August 2025 came to Corradino's attention, and he began to suspect that the Crypto Companies may have been a fundamentally fraudulent enterprise.

242. When Corradino raised Yagudayev's allegations with Shestakov, Shestakov pointed the finger at Yagudayev, claiming in essence that the Yagudayev Complaint was a self-serving document intended as a screen for Yagudayev's own theft and misconduct. Shestakov identified Yagudayev as the principal wrongdoer and as having misappropriated substantial sums from the Crypto Companies.

243. Corradino was alarmed by the fact that, even as the Crypto Companies' Chief Executive and Chief Operating Officers were pointing the finger at each other, they apparently agreed that substantial company funds had disappeared from the Crypto Companies accounts.

244. Indeed, when Corradino confronted Yagudayev with Shestakov's allegations, Yagudayev defended himself by disclosing additional information that he had previously concealed. In support of his position that Shestakov, his family members, and Migirov were the principal wrongdoers, Yagudayev claimed that Shestakov kept two sets of books for Fehu, one false set of books that made a false record of Fehu's purported arbitrage trades, and one set of books reflecting the money laundering formulas that Shestakov had used to misappropriate the Crypto Companies' assets.

245. Now having a window onto the depth of the fraud perpetrated by the Shestakovs, Yagudayev, and Mirgirov, in or around late October 2025, as a first step toward total disinvestment, Corradino requested the withdrawal from Fehu of $300,000 on behalf of his sister and $900,000.00 for himself.

246. On November 6, 2025, Corradino emailed Migirov stating that he was waiting to receive the requested withdrawals.

247. Migirov advised that he was in the process of liquidating positions in connection with this request.

248. On November 11, 2025, Corradino sent Migirov a letter, copying the Shestakovs and Yagudayev, expressing his frustration that the requested funds had not been returned, and Corradino continued to follow up with emails pressing for the return of the requested funds thereafter.

249. On November 21, 2025, Fehu advised Corradino that it would only be able to disburse $750,000.00 in the near term and that it would disburse the remaining amount requested by Corradino "at a later time."

250. Corradino's account with Fehu showed a balance of $3,246,082 as of November 30, 2025.

251. Ultimately, the $300,000 requested on behalf of Corradino's sister was returned on November 14, 2024, and Corradino's $900,000 was paid back in three installments between November 2025 and January 2026.

252. Subsequent attempts to withdraw Corradino's remaining moneys from Fehu have been stonewalled by Migirov, who has apparently directed the fund administrator, NAV Fund Services, not to respond to Corradino's requests or inquiries.

253. Corradino has $550,000 in unreturned principal that was invested with Fehu, in addition to hundreds of thousands of dollars in purported gains that were reflected on his Fehu account statement. Hanley also has $100,000 invested in Fehu that remains unreturned.

254. In addition, on information and belief, Corradino's $300,000 investment in FlexFills has been fraudulently dissipated and is now lost; and JCPE's $550,000 investment in FF Digital has been fraudulently dissipated and is now lost.

255. There is no realistic prospect that these funds will be returned or that the Crypto Companies in which they were invested will continue to function as companies — the Shestakovs,

Yagudayev, Migirov, and the other Defendants have taken what they can and have now turned on each other.

256. On information and belief, the Destination Wallet is not the only repository of funds stolen from the Crypto Companies and Fehu investors by the Individual Defendants.

## COUNT I

## COMMON LAW FRAUD

### (By All Plaintiffs Against German Shestakov and Rudolf Yagudayev)

255. Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs of this Complaint as if set forth fully herein.

256. Shestakov and Yagudayev made material misrepresentations of presently existing or past fact to Plaintiffs in connection with their investments in the Crypto Companies, including but not limited to: (a) that FlexFills, FF Digital, and Fehu were sound investments with extraordinary potential for growth and reliable returns; (b) that Fehu's arbitrage strategies could reasonably be expected to generate safe and reliable returns of 30%; (c) that FlexFills was building a platform that could become the "Bloomberg of Crypto" and was gaining traction with institutional clients; and (d) that the Crypto Companies were properly managed—when, in fact, the Crypto Companies were bereft of internal controls, hemorrhaging cash, and being looted for the personal benefit of Shestakov, Yagudayev, and others under their direction.

257. Shestakov and Yagudayev further made material misrepresentations by omission, in that they failed to disclose to Plaintiffs: (a) that German Shestakov had a documented history of misappropriating company and investor funds dating back to at least 2021; (b) that the Crypto Companies lacked formal accounting or reconciliation procedures, internal controls, compliance programs, or any of the hallmarks of a bona fide financial institution; (c) that funds invested in one Crypto Company were routinely diverted to pay operating expenses or debts of other companies

45

under the their control; (d) that the Crypto Companies were experiencing acute liquidity crises caused by the their mismanagement and theft; (e) that German Shestakov and Yagudayev utilized investor and company funds to pursue trades for their own personal benefit; and (f) that FF Digital had not obtained the BVI VASP registration required to operate legally.

258. Shestakov and Yagudayev knew these representations to be false, or made them with reckless disregard for their truth or falsity. Further, Shestakov and Yagudayev knew or were reckless in not knowing that the true condition of the Crypto Companies — including the precariousness of their finances, the absence of internal controls or compliance functions, and Shestakov's and Yagudayev's repeated use of investments in one Crypto Company to fund the operations of another — was information material to any investor contemplating an investment in FlexFills, FF Digital, Trade Flow, and/or Fehu, but they failed to disclose such information.

259. Yagudayev had specific knowledge of Shestakov's repeated misappropriation of corporate funds, Crypto Companies' non-existent internal controls, and their serial liquidity crises; German Shestakov, as the person with exclusive administrative access to the Crypto Companies' databases and backend infrastructure, was the architect of the fraud.

260. Shestakov and Yagudayev made these misrepresentations with the intention of inducing Plaintiffs to invest and to continue investing in the Crypto Companies. They recruited third-party investors to cover up up and continue to fund their fraudulent and improper trading practices and ultimately for purposes of outright theft. Each time the Crypto Companies faced a liquidity crisis caused by their misconduct, Shestakov and Yagudayev sought fresh infusions of investor capital rather than disclose the true state of affairs.

261. Plaintiffs reasonably relied on Shestakov's and Yagudayev's misrepresentations. Without access to the Crypto Companies' books and records, which were exclusively controlled

by the Shestakovs, Plaintiffs had no independent means of discovering the mismanagement and fraud. Shestakov and Yagudayev used Polombo and Polombo's close relationship to Corradino to gain Corradino's trust, and the Yagudayev Complaint admits that Polombo was a victim of Shestakov and Yagudayev's fraudulent scheme, notwithstanding any role Polombo purportedly had in the Crypto Companies' operations. Plaintiffs' reliance was further buttressed by Corradino's successful initial investment in SHBC, from which he received a modest return, and by the continued production of account statements showing purported positive returns including up until November 2025, when Corradino requested a substantial withdrawal.

262. By virtue of the foregoing, Plaintiffs have suffered damages in an amount to be proven at trial, including but not limited to: Corradino's $300,000 investment in FlexFills, which, on information and belief, has been fraudulently dissipated; JCPE's $550,000 investment in FF Digital, which, on information and belief, has been fraudulently dissipated; Corradino's $550,000 in unreturned principal invested in Fehu; Hanley's $100,000 invested in Fehu that remains unreturned; and $500,000 paid by Corradino to German Shestakov and Yagudayev individually for digital assets known by them to be worthless at the time of sale.

## COUNT II

## CIVIL CONSPIRACY

### (By All Plaintiffs Against All Defendants)

263. Plaintiffs repeat and re-allege each and every allegation contained in the foregoing paragraphs of this Complaint as if set forth fully herein.

264. Under New Jersey law, the elements of civil conspiracy are: (1) a combination of two or more persons acting in concert to commit an unlawful act, or to commit a lawful act by

47

unlawful means; (2) an agreement between the parties to inflict a wrong against or an injury upon another; and (3) an overt act that results in damage.

265. Defendants Shestakov, Gen. Shestakov, Stan. Shestakov, Yagudayev, Migirov, FlexFills, FF Digital, Fehu Capital, Fehu, Shestakov Enterprises LLC, and Yehuda Capital LLC agreed and conspired among themselves to perpetrate the fraud set forth in Count I. The agreement is evidenced by, among other things: the coordinated solicitation of Plaintiffs' investments by Shestakov and Yagudayev while concealing known material risks; Migirov's acting as Fund Manager of Fehu while hundreds of thousands of dollars (or more) belonging to investors disappeared from the fund; Gen. Shestakov's and Stan. Shestakov's role in facilitating the programming of the Platform and the technological infrastructure required to operate the Crypto Companies; the Shestakovs' and Migirov's collective decision on February 20, 2024 not to undertake any internal investigation, audit, or remediation plan despite known misconduct; and the coordinated siphoning of Crypto Company assets for the benefit of all Individual Defendants, with each of the Individual Defendants' knowledge and assistance.

266. In furtherance of their conspiracy, Gen. Shestakov committed overt acts including but not limited to overseeing the programming of the Platform and Stan. Sheskaov committed overt acts including but not limited to creating the technological infrastructure required to operate the Crypto Companies:

267. In furtherance of their conspiracy, Migirov committed overt acts by facilitating, in his capacity as Fehu's Fund Manager, the off-system trading, obfuscatory transfers, and falsified corporate records that allowed the scheme to continue; by aiding Shestakov and Gen. Shestakov in blocking the implementation of internal controls to facilitate continued looting; and by refusing to disclose the true state of the Crypto Companies' operations to Plaintiffs or regulators.

268.    As a direct and proximate result of Defendants' conspiracy and the overt acts committed in furtherance thereof, Plaintiffs have suffered damages in an amount to be proven at trial, including but not limited to the damages set forth in Count I.

**COUNT III**

**AIDING AND ABETTING FRAUD**

**(By All Plaintiffs Against Gennadiy Shestakov, Stanislav Shestakov, and Eugene Migirov)**

269.    Plaintiffs repeat and re-allege each and every allegation contained in the foregoing paragraphs of this Complaint as if set forth fully herein.

270.    Under New Jersey law, a party is liable for aiding and abetting a tort where: (1) the party whom the defendant aids performs a wrongful act that causes an injury; (2) the defendant is generally aware of his role as part of an overall illegal or tortious activity at the time that he provides the assistance; and (3) the defendant knowingly and substantially assists the principal violation.

271.    As set forth in Count I, Shestakov and Yagudayev committed the tort of fraud against Plaintiffs by making material misrepresentations and omissions in connection with Plaintiffs' investments in the Crypto Companies, which caused Plaintiffs' injuries.

272.    Defendants Gen. Shestakov, Stan. Shestakov, and Migirov were each generally aware of their respective roles as part of the overall fraudulent scheme at the time they provided assistance.

273.    Gen. Shestakov maintained exclusive administrative access to the Crypto Companies' backend systems alongside Shestakov, which enabled and concealed the diversion of investor funds. Stan. Shestakov held responsibilities for the development and maintenance of the Crypto Companies' technology platforms and infrastructure, and participated with the other Individual Defendants in the management and execution of the Crypto Companies' schemes.

Migirov, as Fund Manager of Fehu, facilitated the off-system trading, obfuscatory transfers, and falsified corporate records that allowed the scheme to continue.

274.    Gen. Shestakov, Stan. Shestakov, and Migirov each knowingly and substantially assisted German Shestakov's and Yagudayev's fraud.

275.    As a direct and proximate result of the substantial assistance provided by Gen. Shestakov, Stan. Shestakov, and Migirov to the fraud set forth in Count I, Plaintiffs have suffered damages in an amount to be proven at trial, including but not limited to the damages set forth in Count I.

## COUNT IV

## PIERCING THE CORPORATE VEIL

**(By All Plaintiffs Against German Shestakov and Rudolf Yagudayev, to Reach Their Personal Assets for Investments Made by Plaintiffs in FlexFills, FF Digital, Trade Flow, and Fehu)**

276.    Plaintiffs repeat and re-allege each and every allegation contained in the foregoing paragraphs of this Complaint as if set forth fully herein.

277.    Under New Jersey law, the corporate veil may be pierced where: (a) there is such unity of interest and ownership that the separate personalities of the corporation and the individual no longer exist; and (b) adherence to the fiction of separate corporate existence would sanction a fraud or promote injustice.

278.    With respect to FlexFills, FF Digital, Fehu, and Trade Flow, there exists such unity of interest and ownership between these entities and Shestakov and Yagudayev that the separate personalities of these corporations and these two Individual Defendants no longer exist. Specifically: (a) the Crypto Companies were grossly undercapitalized and repeatedly required emergency infusions of investor capital to remain solvent; (b) Shestakov and Yagudayev failed to observe corporate formalities, including the failure to execute formal license agreements, asset

purchase agreements, or corporate resolutions, and operated on the basis of personal assurances rather than formal governance authorization; (c) the Crypto Companies were insolvent or on the verge of insolvency at multiple relevant times; (d) Shestakov and, to a lesser extent, Yagudayev, siphoned funds from the Crypto Companies for personal benefit, including misappropriating investor funds for personal trades, and Shestakov ultimately routed significant stolen assets to a cryptocurrency "Destination Wallet" under his control; (e) other officers and directors were non-functioning or their roles were shams because the officers were not permitted to exercise any actual managerial authority, and the CFO's access was revoked without cause; and (f) the Crypto Companies were merely a facade for the operations of Shestakov and Yagudayev's fraudulent scheme, with Shestakov and Yagudayev treating the Companies as interchangeable funding sources for their personal financial ambitions.

279.    Further, the Shestakov and Yagudayev freely utilized funds invested in one Crypto Company for the benefit of another, failed to maintain separate books and records for each entity, commingled personal and corporate accounts, and used investor capital from JCPE's FF Digital investment expressly to pay FlexFills debts—all without disclosure to Plaintiffs.

280.    Adherence to the fiction of separate corporate existence for FlexFills, FF Digital, Fehu, and Trade Flow would sanction a fraud and promote injustice, because these entities were used by Shestakov and Yagudayev to perpetrate the fraudulent scheme described herein, to misappropriate Plaintiffs' investments, and to shield the Shestakov's and Yagudayev's personal assets from liability for their misconduct.

281.    Accordingly, the Court should disregard the corporate forms of FlexFills, FF Digital, Fehu, and Trade Flow and hold Shestakov and Yagudayev personally liable for Plaintiffs' damages arising from their investments in these entities.

**COUNT V**
**VIOLATION OF SECTION 10(b) OF THE SECURITIES EXCHANGE ACT OF 1934**
**AND SEC RULE 10b-5**
**(By Corradino Against FlexFills and Trade Flow)**

282. Plaintiff Corradino repeats and re-alleges each and every allegation contained in the foregoing paragraphs of this Complaint as if set forth fully herein.

283. Corradino's purchase of a 5.0% membership interest in FlexFills for $300,000, executed pursuant to a Membership Interest Purchase Agreement on or about January 25, 2023, constituted the purchase of a security within the meaning of Section 10(b) of the Securities Exchange Act of 1934 and SEC Rule 10b-5.

284. The investment was solicited and made in the State of New Jersey, FlexFills's operations took place in New Jersey, and Corradino's investment was made on the understanding that he would realize a return on investment without any work or effort on Corradino's part.

285. In connection with Corradino's purchase of this security, FlexFills, acting through its officers and agents, committed deceptive acts in furtherance of a scheme to defraud, including: (a) misrepresenting FlexFills's growth prospects and financial condition by touting it as a potentially transformative platform for institutional crypto investors while concealing that it was undercapitalized, lacked internal controls, and had been subjected to repeated misappropriation by its CEO; (b) failing to disclose that FlexFills had experienced a substantial liquidity crisis in 2022 caused by Shestakov's misconduct, that its trading strategies were "not ready for production," and that the IRS had previously questioned Shestakov's use of corporate funds for personal trades; and (c) utilizing sham corporate structures, undisclosed commingling of funds, and falsified records to conceal the true state of FlexFills's operations.

286. FlexFills acted with scienter, in that its officers and controlling persons—Shestakov and Yagudayev—had actual knowledge that the representations made to Corradino immediately

52

prior to his investment for the purposes of inducing that investment were false and made those representations with the intent to deceive Corradino and to induce him to invest in FlexFills. Further, Shestakov and Yagudayev knew or were reckless in not knowing that the true condition of FlexFills — including the precariousness of its finances, the absence of internal controls or compliance functions, and Shestakov's and Yagudayev's repeated use of investments in FlexFills to fund the operations of other Crypto Companies — was information material to any investor contemplating an investment in FlexFills, but they failed to disclose such information.

287. Corradino reasonably relied on Yagudayev's misstatements about FlexFills's potential and on the adequacy of the information disclosed about FlexFills in making his investment. Without access to FlexFills's books and records, which were exclusively controlled by the Shestakovs, Corradino had no independent means of uncovering the fraud. Shestakov and Yagudayev used Polomobo and Polombo's close relationship to Corradino to gain Corradino's trust, and the Yagudayev Complaint admits that Polombo was a victim of Shestakov and Yagudayev's fraudulent scheme. Corradino's reliance was further supported by his prior successful experience with SHBC and by Yagudayev's specific representations regarding FlexFills's institutional growth potential.

288. Development of the intellectual property powering the FF Digital Platform was FlexFills's only function, and the intellectual property itself, FlexFills's only asset.

289. The absence of any internal controls or compliance functions enabled the total dissipation of FlexFills's corporate assets by Yagudayev and Shestakov — as Yagudayev concedes in his own Complaint — and prevented the development of a viable cryptocurrency platform that had any prospect of competing in the marketplace for institutional clients. Thus, as a direct result of the company's lack of internal controls having enabled Shestakov's and Yagudayev's pervasive

53

misappropriation of corporate assets, FlexFills no longer has any corporate assets to speak of (including because the intellectual property powering the FF Digital Platform is worthless) and FlexFills itself has no value.

290.    Trade Flow was apparently contemplated by Shestakov and Yagudayev as a successor entity to FlexFills. On information and belief, the transition of FlexFills to Trade Flow was never legally accomplished. To the extent that Trade Flow did become a successor to FlexFills, however, these allegations apply equally to Trade Flow, because Corradino's investment in FlexFills occurred before this transition was initiated.

291.    As a direct and proximate result of FlexFills's violations of Section 10(b) and Rule 10b-5, Corradino has suffered losses in an amount to be proven at trial, including the loss of his entire $300,000 investment in FlexFills, which has been fraudulently dissipated.

## COUNT VI

## VIOLATION OF SECTION 10(b) OF THE SECURITIES EXCHANGE ACT OF 1934 AND SEC RULE 10b-5

### (by JCPE Against FF Digital)

292.    Plaintiff JCPE repeats and re-alleges each and every allegation contained in the foregoing paragraphs of this Complaint as if set forth fully herein.

293.    JCPE's purchase of a 5% equity stake in FF Digital for $550,000 in or around December 2023 constituted the purchase of a security within the meaning of Section 10(b) of the Securities Exchange Act of 1934 and SEC Rule 10b-5.

294.    JCPE's investment in FF Digital was solicited and made in the State of New Jersey, FF Digital's operations took place in New Jersey, and JCPE's investment was made on the understanding that it would realize a return on investment without any work or effort by JCPE.

295.     In connection with JCPE's purchase of this security, FF Digital, acting through its officers and agents, committed deceptive acts in furtherance of a scheme to defraud, including: (a) misrepresenting FF Digital's value by implying an $11 million valuation for a company that was not close to running as a legitimate company, much less profitability; (b) concealing that the investment proceeds would be diverted to pay FlexFills's outstanding bridge loans, internal margin liabilities, and external financial liabilities rather than being used to develop FF Digital's business; (c) failing to disclose Shestakov's repeated misappropriation of corporate funds, the Crypto Companies' non-existent internal controls, and the February 2024 discovery that over $300,000 in losses had been improperly misappropriated from the amounts invested by JCPE in FF Digital; and (d) utilizing sham corporate structures and purported licensing arrangements unsupported by executed agreements, to obscure the true nature of FF Digital's operations.

296.     FF Digital acted with scienter, in that its officers and controlling persons — Shestakov and Yagudayev — knew that the representations made to JCPE were false and that JCPE's investment proceeds would be diverted to cover FlexFills's debts or for their own illicit financial gain.

297.     JCPE reasonably relied on FF Digital's deceptive acts in making its investment. JCPE had no access to FF Digital's books and records, which were controlled by the Shestakovs, and had no independent means of discovering that FF Digital's valuation was inflated, that its investment proceeds would be diverted, or that over $300,000 of its investment would be misappropriated by Shestakov.

298.     Moreover, Corradino and Polombo collectively own 94.3% of JCPE, and Shestakov and Yagudayev used Polomobo and Polombo's close relationship to Corradino to gain Corradino's trust. The Yagudayev Complaint admits that Polombo was a victim of Shestakov and

Yagudayev's fraudulent scheme. Corradino's reliance was further supported by his prior successful experience with SHBC and by Yagudayev's specific representations regarding FlexFills's institutional growth potential.

299.    FF Digital's lack of internal controls and viable compliance function (i) prevented FF Digital from obtaining the BVI VASP license that is required for it to legally operate as a crypto currency trading platform and (ii), according to Yagudayev's own Complaint, allowed for the misappropriation of FF Digital's assets by Shestakov and Yagudayev that have left FF Digital without any ability to function as a company and without any assets. FF Digital as a company therefore has no value whatsoever, and JCPE's $550,000 investment is worthless.

300.    As a direct and proximate result of FF Digital's violations of Section 10(b) and Rule 10b-5, JCPE 1 has suffered losses in an amount to be proven at trial, including the loss of its entire $550,000 investment in FF Digital, which has been fraudulently dissipated.

## COUNT VII

## VIOLATION OF SECTION 10(b) OF THE SECURITIES EXCHANGE ACT OF 1934 AND SEC RULE 10b-5

### (By Corradino and Hanley Against Fehu)

301.    Plaintiffs Corradino and Hanley repeat and re-allege each and every allegation contained in the foregoing paragraphs of this Complaint as if set forth fully herein.

302.    Corradino's investment of $2.95 million in Fehu, funded by wire transfers between April 17, 2024 and July 11, 2024, and Hanley's investment of $400,000 in Fehu, funded by wire transfer on or about March 20, 2025, each constituted an investment contract and is each, therefore, a security within the meaning of Section 10(b) of the Securities Exchange Act of 1934 and SEC Rule 10b-5.

303. Corradino's and Hanley's investments in Fehu were solicited and made in the State of New Jersey, Fehu's operations were conducted from New Jersey, and each investment was made on the understanding that Corradino and Hanley would realize a return on their investment through the managerial and trading efforts of Fehu and certain of the Individual Defendants, without any work or effort on the part of Corradino or Hanley.

304. In connection with these purchases, Fehu, acting through its officers and agents, committed deceptive acts in furtherance of a scheme to defraud, made untrue statements of material fact and omitted material facts, and engaged in acts, practices, and a course of business that operated as a fraud and deceit, including: (a) representing that Fehu had developed and employed a proprietary arbitrage strategy based on short-term price differentials in cryptocurrencies that could safely and reliably generate returns of approximately 30% while limiting investor risk, when in fact Fehu had no proven algorithms or strategy and its strategy remained under development; (b) failing to disclose Shestakov's history of misappropriating company and investor funds or the routine diversion of funds invested in one Crypto Company to cover the obligations of another; (c) failing to disclose the absence of any effective internal controls or compliance functions at Fehu that were necessary to operate as a viable fund; (d) permitting Shestakov and Yagudayev to borrow investor funds for purposes of executing trades to benefit themselves personally, rather than the fund; and (e) diverting Fehu investor funds into wallets and accounts controlled by Shestakov rather than deploying them in the trading strategy represented to investors.

305. Fehu acted with scienter, in that its officers and controlling persons—Shestakov as Chief Executive Officer, Yagudayev as Chief Operating Officer, and Migirov as Fund Manager— had actual knowledge that the representations made to Corradino and Hanley were false, or acted

57

with reckless disregard for their truth or falsity, and knew that the omitted facts were material to any investor contemplating an investment in Fehu. Among other things, Shestakov maintained two sets of books for Fehu, one falsely recording purported arbitrage trades and one reflecting the formulas used to misappropriate and launder the Crypto Companies' assets; Yagudayev had caught Shestakov using corporate funds for his personal benefit on multiple occasions prior to Corradino's and Hanley's investments; and Migirov, as Fund Manager, knew or was reckless in not knowing that substantial investor funds were being misappropriated from Fehu and/or utilized for personal trades by Shestakov.

306.    In the absence of required disclosures, Corradino and Hanley reasonably relied on Yagudayev's representations regarding Fehu's arbitrage strategy and the safety and reliability of its returns in making and augmenting his investment. Without access to Fehu's books and records, which were exclusively controlled by the Shestakovs and Migirov, Corradino had no independent means of discovering the fraud, and his reliance was reinforced by his prior successful experience with SHBC and by the account statements showing purported positive returns.

307.    On information and belief, Fehu no longer possesses funds adequate to repay Corradino and Hanley because, as a direct result of Fehu's lack of internal policies and controls and the malfeasance of its owners and officers, these funds have been stolen.

308.    As a direct and proximate result of Fehu's violations of Section 10(b) and Rule 10b-5, Corradino and Hanley have suffered economic losses in amounts to be proven at trial, including Corradino's $550,000 in unreturned principal invested in Fehu, together with the purported gains reflected on his Fehu account statements, and Hanley's $100,000 in unreturned principal invested in Fehu.

## COUNT VIII

### Control Person Liability Under Section 20(a) of the Securities Exchange Act of 1934

### (By Plaintiff Corradino Against Shestakov and Yagudayev in Connection with Corradino's Investment in FlexFills)

309.    Plaintiff Corradino repeats and re-alleges each of the allegations set forth in the preceding paragraphs of this Complaint as if fully set forth herein.

310.    Section 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78t(a), imposes joint and several liability on every person who, directly or indirectly, controls any person liable under any provision of the Exchange Act, unless the controlling person acted in good faith and did not directly or indirectly induce the acts constituting the violation.

311.    At all relevant times, Plaintiff Corradino's investment in FlexFills—specifically, his purchase in New Jersey of a 5.0% membership interest in FlexFills, operated out of New Jersey, for $300,000 pursuant to a Membership Interest Purchase Agreement executed on or about January 25, 2023—constituted the purchase of a security within the meaning of Section 3(a)(10) of the Exchange Act.

312.    As alleged in Count V above, FlexFills committed a primary violation of Section 10(b) of the Exchange Act and SEC Rule 10b-5 in connection with the sale of a FlexFills membership interest to Corradino, by making material misrepresentations and omissions, with scienter, in connection with the purchase or sale of a security, upon which Corradino relied, causing economic loss. That predicate violation is incorporated herein by reference and forms the basis for this Section 20(a) claim.

313.    Defendant Shestakov controlled FlexFills within the meaning of Section 20(a). At all relevant times, Shestakov served as the Chief Executive Officer of FlexFills, co-founded the company, directed its operations, maintained (together with Gen. Shestakov) exclusive

administrative access to FlexFills's databases, backend infrastructure, and codebase, and possessed the power to direct FlexFills's management and policies, including the power to control the content of representations made to investors in connection with the sale of FlexFills securities.

314. Defendant Yagudayev controlled FlexFills within the meaning of Section 20(a). At all relevant times, Yagudayev served as the Chief Operating Officer of FlexFills, co-founded the company, held his equity interest through Yehuda Capital LLC, directed FlexFills's operational, financial, and investor-facing activities, personally solicited Corradino's investment and made the representations upon which Corradino relied, and possessed the power to direct FlexFills's management and policies.

315. Shestakov was a culpable participant in the fraud perpetrated through FlexFills. He knowingly and substantially participated in the wrongdoing by, among other things: misappropriating FlexFills investor and company funds for personal trading and personal expenses on repeated occasions; lying about critical operational information; blocking the implementation of internal controls to facilitate his continued looting of corporate assets; and refusing to adopt compliance, accounting, and anti-money-laundering policies necessary for FlexFills to obtain its BVI VASP license and otherwise to operate lawfully.

316. Yagudayev was a culpable participant in the fraud perpetrated through FlexFills. Yagudayev knowingly and substantially participated in the wrongdoing, and acted with inaction intended to further the fraud or prevent its discovery, by, among other things: personally soliciting Corradino's investment in FlexFills while possessing specific knowledge that FlexFills lacked internal controls, compliance programs, and accounting procedures; failing to disclose to Corradino known risks including Shestakov's repeated misappropriation of funds, the Company's

liquidity crises, and the absence of safeguards for investor capital; and failing to alert regulators or investors despite his responsibilities as Chief Operating Officer.

317. By reason of the foregoing, Shestakov and Yagudayev are jointly and severally liable to Corradino as controlling persons of FlexFills under Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), for all damages sustained by Corradino in connection with his investment in FlexFills, in an amount to be proven at trial.

## COUNT IX

### Control Person Liability Under Section 20(a) of the Securities Exchange Act of 1934

### (By Plaintiff JCP Enterprises 1 LLC Against Shestakov and Yagudayev in Connection with JCPE's Investment in FF Digital)

318. Plaintiff JCPE repeats and re-alleges each of the allegations set forth in the preceding paragraphs of this Complaint as if fully set forth herein.

319. At all relevant times, JCPE's investment in FF Digital — specifically, its purchase of a 5.0% equity stake in FF Digital for $550,000 in or around December 2023 — constituted the purchase of a security within the meaning of Section 3(a)(10) of the Exchange Act.

320. As alleged in Count VI above, FF Digital committed a primary violation of Section 10(b) of the Exchange Act and SEC Rule 10b-5 in connection with the sale of FF Digital equity to JCPE, by making material misrepresentations and omissions, with scienter, in connection with the purchase or sale of a security, upon which JCPE relied, causing economic loss. That predicate violation is incorporated herein by reference and forms the basis for this Section 20(a) claim.

321. Defendant Shestakov controlled FF Digital within the meaning of Section 20(a). At all relevant times, Shestakov served as the Chief Executive Officer of FF Digital, co-founded the company, directed its operations, maintained (along with Gen. Shestakov) exclusive administrative access to the technology systems powering FF Digital's Platform, and possessed

61

the power to direct FF Digital's management and policies, including the content of representations made to investors in connection with the sale of FF Digital securities.

322. Yagudayev controlled FF Digital within the meaning of Section 20(a). At all relevant times, Yagudayev served as the Chief Operating Officer of FF Digital, co-founded the company, held his equity interest through Yehuda Capital LLC, directed FF Digital's operational and investor-facing activities, participated in soliciting and accepting JCPE's investment, and possessed the power to direct FF Digital's management and policies.

323. Shestakov and Yagudayev were each culpable participants in the fraud perpetrated through FF Digital, for the same reasons and on the same factual bases set forth in Count VIII above with respect to FlexFills, and additionally because: Shestakov and Yagudayev collected JCPE's $550,000 investment for the express and improper purpose of paying down FlexFills's outstanding debts rather than deploying the capital for FF Digital's business; the Yagudayev Complaint confirms that, following receipt of JCPE's investment, "FlexFills successfully cleared all outstanding bridge loans, internal margin liabilities, and external financial liabilities"; Yagudayev discovered in January and February 2024 that over $300,000 in losses had been improperly misappropriated from amounts invested by JCPE in FF Digital; and Shestakov and Yagudayev failed to disclose to JCPE that FF Digital lacked internal controls, compliance programs, accounting procedures, or any of the operational infrastructure necessary to function as a legitimate regulated financial entity.

324. By reason of the foregoing, Shestakov and Yagudayev are jointly and severally liable to Plaintiff JCPE as controlling persons of FF Digital under Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), for all damages sustained by JCPE in connection with its investment in FF Digital, in an amount to be proven at trial.

## COUNT X

### Control Person Liability Under Section 20(a) of the Securities Exchange Act of 1934

### (By Corradino and Hanley Against Shestakov, Yagudayev, and Migirov in Connection with Their Investments in Fehu)

325.　Plaintiffs Corradino and Hanley repeat and re-allege each of the allegations set forth in the preceding paragraphs of this Complaint as if fully set forth herein.

326.　At all relevant times, Corradino's investment of $2.95 million in Fehu and Hanley's investment of $400,000 in Fehu constituted the purchase of securities within the meaning of Section 3(a)(10) of the Exchange Act.

327.　As alleged in Count VII above, Fehu committed a primary violation of Section 10(b) of the Exchange Act and SEC Rule 10b-5 in connection with the Corradino's and Hanley's investment in the Fehu fund, by making material misrepresentations and omissions, with scienter, upon which Corradino and Hanley relied, causing economic loss. That predicate violation is incorporated herein by reference and forms the basis for this Section 20(a) claim.

328.　Defendant Shestakov controlled Fehu within the meaning of Section 20(a). At all relevant times, Shestakov served as the Chief Executive Officer of Fehu, co-founded and directed the enterprise, maintained (together with Gen. Shestakov) exclusive administrative access to the Crypto Companies' databases, backend infrastructure, and trading records, and possessed the power to direct Fehu's management and policies, including the content of representations made to investors and the calculation and reporting of Fehu's net asset value and returns.

329.　Defendant Yagudayev controlled Fehu within the meaning of Section 20(a). At all relevant times, Yagudayev served as the Chief Operating Officer of Fehu, held his equity interest through Yehuda Capital LLC, directed Fehu's operational and investor-facing activities,

63

personally solicited Corradino's investments in Fehu and made the representations upon which Corradino relied, and possessed the power to direct Fehu's management and policies.

330. Defendant Migirov controlled Fehu within the meaning of Section 20(a). At all relevant times, Migirov served as the Fund Manager of Fehu and, in this capacity, directed the fund's operations and the administration of investor accounts, controlled communications with investors regarding their accounts and redemptions, and directed the fund administrator, NAV Fund Services; Migirov therefore possessed the power to direct Fehu's management and policies.

331. German Shestakov and Yagudayev were each culpable participants in the fraud perpetrated through Fehu, knowingly and substantially participating in the wrongdoing by, among other things, misappropriating Fehu investor and company funds for personal trading and expenses, maintaining false books and concealing off-system trading activity, blocking the implementation of internal controls, and failing to disclose to Corradino and Hanley the known risks to their investments.

332. Migirov was a culpable participant in the fraud perpetrated through Fehu, knowingly and substantially participating by, among other things, facilitating in his capacity as Fund Manager the off-system trading, obfuscatory transfers, and falsified reconciliation records that allowed the scheme to continue, ignoring the disappearance of substantial investor funds, assigning Polombo meaningless reconciliation tasks to preserve the appearance of internal controls, and stonewalling Corradino's and Hanley's efforts to redeem their investments, including by directing NAV Fund Services not to respond to their inquiries.

333. By reason of the foregoing, Shestakov, Yagudayev, and Migirov are jointly and severally liable to Corradino and Hanley as controlling persons of Fehu under Section 20(a) of the

Exchange Act, 15 U.S.C. § 78t(a), for all damages sustained by Corradino and Hanley in connection with their investments in Fehu, in an amount to be proven at trial.

**COUNT XI**

**VIOLATION OF THE NEW JERSEY UNIFORM SECURITIES LAW,
N.J.S.A. 49:3-71(a)**

**(By Corradino Against FlexFills and Trade Flow)**

334.    Plaintiff Jack Corradino repeats and re-alleges each and every allegation contained in the foregoing paragraphs of this Complaint as if set forth fully herein.

335.    N.J.S.A. 49:3-71(a) imposes civil liability on any person who offers or sells a security by means of any untrue statement of a material fact or any omission to state a material fact necessary to make the statements made not misleading, or who employs any device, scheme, or artifice to defraud, or who engages in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person. Under N.J.S.A. 49:3-71(b), the buyer must sustain the burden of proof that the seller knew of the untruth or omission and intended to deceive the buyer, and that the buyer suffered a financial detriment.

336.    Corradino's purchase of a 5.0% membership interest in FlexFills for $300,000, executed pursuant to a Membership Interest Purchase Agreement on or about January 25, 2023, constituted the purchase of a security within the meaning of the New Jersey Uniform Securities Law, N.J.S.A. 49:3-49 *et seq*.

337.    The investment was solicited and made in the State of New Jersey, FlexFills's operations took place in New Jersey, and Corradino's investment was made on the understanding that he would realize a return on investment without any work or effort on Corradino's part.

338.    In connection with Corradino's purchase of this security, FlexFills, acting through its officers and agents, sold the security by means of untrue statements of material fact and material

65

omissions, employed devices, schemes, and artifices to defraud, and engaged in acts, practices, and a course of business operating as a fraud and deceit upon Corradino, all as more fully alleged in Count V above, which allegations are incorporated herein by reference.

339.   FlexFills knew of the untruths and omissions and intended to deceive Corradino, as more fully alleged in Count V above. FlexFills's officers and controlling persons — Shestakov and Yagudayev — had actual knowledge that the representations made to Corradino were false and made those representations with the intent to deceive Corradino and to induce him to invest in FlexFills. Corradino did not know of the untruths or omissions at the time of his purchase.

340.   Trade Flow was apparently contemplated by Shestakov and Yagudayev as a successor entity to FlexFills. On information and belief, the transition of FlexFills to Trade Flow was never legally accomplished. To the extent that Trade Flow did become a successor to FlexFills, however, these allegations apply equally to Trade Flow, because Corradino's investment in FlexFills occurred before this transition was initiated.

341.   Corradino has suffered a financial detriment as a direct result of FlexFills's violations of N.J.S.A. 49:3-71(a). Pursuant to N.J.S.A. 49:3-71(c), Corradino is entitled to recover the consideration paid for the security, together with interest at the rate established for interest on judgments by the Rules Governing the Courts of the State of New Jersey from the date of payment, and costs, less the amount of any income received on the security, upon the tender of the security, or for damages if he no longer owns the security, in an amount to be proven at trial, including the loss of his entire $300,000 investment in FlexFills.

## COUNT XII

## VIOLATION OF THE NEW JERSEY UNIFORM SECURITIES LAW, N.J.S.A. 49:3-71(a)

### (By JCPE Against FF Digital)

342. Plaintiff JCPE repeats and re-alleges each and every allegation contained in the foregoing paragraphs of this Complaint as if set forth fully herein.

343. JCPE's purchase of a 5% equity stake in FF Digital for $550,000 in or around December 2023 constituted the purchase of a security within the meaning of the New Jersey Uniform Securities Law, N.J.S.A. 49:3-49 *et seq*.

344. The investment was solicited and made in the State of New Jersey, FF Digital's operations took place in New Jersey, and Corradino's investment was made on the understanding that he would realize a return on investment without any work or effort on Corradino's part.

345. In connection with JCPE's purchase of this security, FF Digital, acting through its officers and agents, sold the security by means of untrue statements of material fact and material omissions, employed devices, schemes, and artifices to defraud, and engaged in acts, practices, and a course of business operating as a fraud and deceit upon JCPE, all as more fully alleged in Count VI above, which allegations are incorporated herein by reference.

346. FF Digital knew of the untruths and omissions and intended to deceive JCPE, as more fully alleged in Count VI above. FF Digital's officers and controlling persons — Shestakov and Yagudayev—had actual knowledge that the representations made to JCPE were false, including that JCPE's investment proceeds would be diverted to cover FlexFills's debts rather than being used to develop FF Digital's business as represented. JCPE did not know of the untruths or omissions at the time of its purchase.

67

347.    JCPE has suffered a financial detriment as a direct result of FF Digital's violations of N.J.S.A. 49:3-71(a). Pursuant to N.J.S.A. 49:3-71(c), JCPE is entitled to recover the consideration paid for the security, together with interest at the rate established for interest on judgments by the Rules Governing the Courts of the State of New Jersey from the date of payment, and costs, less the amount of any income received on the security, upon the tender of the security, or for damages if it no longer owns the security, in an amount to be proven at trial, including the loss of its entire $550,000 investment in FF Digital.

## COUNT XIII

## VIOLATION OF THE NEW JERSEY UNIFORM SECURITIES LAW, N.J.S.A. 49:3-71(a)

### (By Corradino and Hanley Against Fehu)

348.    Plaintiffs Corradino and Hanley repeat and re-allege each and every allegation contained in the foregoing paragraphs of this Complaint as if set forth fully herein.

349.    Corradino's investment of $2.95 million in Fehu, funded by wire transfers between April 17, 2024 and July 11, 2024, and Hanley's investment of $400,000 in Fehu, funded by wire transfer on or about March 20, 2025, each constituted an investment contract and is each, therefore, a security within the meaning of the New Jersey Uniform Securities Law, N.J.S.A. 49:3-49 *et seq*.

350.    The investments were solicited and made in the State of New Jersey, Fehu's operations were conducted from New Jersey, and each investment was made on the understanding that Corradino and Hanley would realize a return on their investment through the managerial and trading efforts of Fehu and certain of the Individual Defendants, without any work or effort on the part of Corradino or Hanley.

351.    In connection with Corradino's and Hanley's purchases of these securities, Fehu, acting through its officers and agents, sold the securities by means of untrue statements of material

fact and material omissions, employed devices, schemes, and artifices to defraud, and engaged in acts, practices, and a course of business operating as a fraud and deceit upon Corradino and Hanley, all as more fully alleged in Count VII above, which allegations are incorporated herein by reference.

352. Fehu knew of the untruths and omissions and intended to deceive Corradino and Hanley, as more fully alleged in Count VII above. Fehu's officers and controlling persons—Shestakov as Chief Executive Officer, Yagudayev as Chief Operating Officer, and Migirov as Fund Manager—had actual knowledge that the representations made to Corradino and Hanley were false and made those representations with the intent to deceive Corradino and Hanley and to induce them to invest in Fehu. Corradino and Hanley did not know of the untruths or omissions at the time of their purchases.

353. Corradino and Hanley have suffered a financial detriment as a direct result of Fehu's violations of N.J.S.A. 49:3-71(a). Pursuant to N.J.S.A. 49:3-71(c), Corradino and Hanley are each entitled to recover the consideration paid for the security, together with interest at the rate established for interest on judgments by the Rules Governing the Courts of the State of New Jersey from the date of payment, and costs, less the amount of any income received on the security, upon the tender of the security, or for damages if they no longer own the security, in amounts to be proven at trial, including Corradino's $550,000 in unreturned principal invested in Fehu and Hanley's $100,000 in unreturned principal.

## COUNT XIV

## CONTROL PERSON LIABILITY UNDER N.J.S.A. 49:3-71(d) OF THE NEW JERSEY UNIFORM SECURITIES LAW

### (By Corradino Against Shestakov and Yagudayev in Connection with Corradino's Investment in FlexFills)

354.    Plaintiff Corradino repeats and re-alleges each of the allegations set forth in the preceding paragraphs of this Complaint as if fully set forth herein.

355.    N.J.S.A. 49:3-71(d) provides that every person who directly or indirectly controls a seller liable under N.J.S.A. 49:3-71(a), every partner, officer, or director of such a seller, every person occupying a similar status or performing similar functions, and every employee of such a seller who materially aids in the sale or in the conduct giving rise to the liability, is also liable jointly and severally with and to the same extent as the seller, unless the nonseller sustains the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of the existence of the facts which give rise to liability. Federal securities law concepts are used to define "control person" liability under the New Jersey statute.

356.    As alleged in Count XI above, FlexFills is liable as a seller under N.J.S.A. 49:3-71(a) for the sale of a FlexFills membership interest to Corradino by means of untrue statements of material fact, material omissions, and fraudulent schemes and practices. That predicate violation is incorporated herein by reference.

357.    Defendants Shestakov and Yagudayev each directly or indirectly controlled FlexFills and served as officers of FlexFills within the meaning of N.J.S.A. 49:3-71(d), and each materially aided in the sale of the FlexFills membership interest to Corradino and in the conduct giving rise to FlexFills's liability, for all of the reasons and on all of the factual bases set forth in Count XI above, which allegations are incorporated herein by reference.

358.    Neither Shestakov nor Yagudayev can sustain the burden of proof that they did not know, and in the exercise of reasonable care could not have known, of the existence of the facts giving rise to FlexFills's liability. As alleged herein, German Shestakov was the architect of the fraud; Gennadiy Shestakov shared exclusive administrative access to FlexFills's systems and participated in the looting of investor funds; and Yagudayev had specific, contemporaneous knowledge of Shestakov's misconduct, FlexFills's lack of internal controls, and the falsity of the representations made to Corradino.

359.    By reason of the foregoing, Shestakov and Yagudayev are jointly and severally liable to Plaintiff Corradino under N.J.S.A. 49:3-71(d) for all damages sustained by Corradino in connection with his investment in FlexFills, including the consideration paid for the security together with interest and costs, in an amount to be proven at trial.

### COUNT XV

### CONTROL PERSON LIABILITY UNDER N.J.S.A. 49:3-71(d) OF THE NEW JERSEY UNIFORM SECURITIES LAW

**(By JCPE Against Shestakov and Yagudayev
in Connection with JCPE's Investment in FF Digital)**

360.    Plaintiff JCPE repeats and re-alleges each of the allegations set forth in the preceding paragraphs of this Complaint as if fully set forth herein.

361.    As alleged in Count XII above, FF Digital is liable as a seller under N.J.S.A. 49:3-71(a) for the sale of FF Digital equity to JCPE by means of untrue statements of material fact, material omissions, and fraudulent schemes and practices. That predicate violation is incorporated herein by reference.

362.    Defendants Shestakov and Yagudayev each directly or indirectly controlled FF Digital and served as officers of FF Digital within the meaning of N.J.S.A. 49:3-71(d), and each materially aided in the sale of FF Digital equity to JCPE and in the conduct giving rise to FF

Digital's liability, for all of the reasons and on all of the factual bases set forth in Count XII above, which allegations are incorporated herein by reference.

363.    Neither Shestakov nor Yagudayev can sustain the burden of proof that they did not know, and in the exercise of reasonable care could not have known, of the existence of the facts giving rise to FF Digital's liability. As alleged herein, Shestakov and Yagudayev collected JCPE's investment for the express purpose of paying down FlexFills's debts; Shestakov shared exclusive administrative access to the systems powering FF Digital's Platform; and Shestakov and Yagudayev had actual knowledge of the Crypto Companies' complete lack of internal controls and compliance infrastructure. Additionally, they both knew that these deficiencies and the Platform's deficiencies would prevent FF Digital from operating as a BVI VASP that could appeal to institutional investors.

364.    By reason of the foregoing, Shestakov and Yagudayev are jointly and severally liable to Plaintiff JCPE under N.J.S.A. 49:3-71(d) for all damages sustained by JCPE in connection with its investment in FF Digital, including the consideration paid for the security together with interest and costs, in an amount to be proven at trial.

## COUNT XVI

### CONTROL PERSON LIABILITY UNDER N.J.S.A. 49:3-71(d)
### OF THE NEW JERSEY UNIFORM SECURITIES LAW

### (By Corradino and Hanley Against Shestakov, Yagudayev, and Migirov
### in Connection with Their Investments in Fehu)

365.    Plaintiffs Corradino and Hanley repeat and re-allege each of the allegations set forth in the preceding paragraphs of this Complaint as if fully set forth herein.

366.    As alleged in Count XIII above, Fehu is liable as a seller under N.J.S.A. 49:3-71(a) for the sale of Fehu interests to Corradino and Hanley by means of untrue statements of material

fact, material omissions, and fraudulent schemes and practices. That predicate violation is incorporated herein by reference.

367. Defendants Shestakov and Yagudayev each directly or indirectly controlled Fehu and served as officers of Fehu within the meaning of N.J.S.A. 49:3-71(d), and each materially aided in the sale of the Fehu interests to Corradino and Hanley and in the conduct giving rise to Fehu's liability, for all of the reasons and on all of the factual bases set forth in Counts XVII and XVIII above, which allegations are incorporated herein by reference. Shestakov served as Fehu's Chief Executive Officer and maintained, together with Gen. Shestakov, exclusive administrative access to the Crypto Companies' databases, backend infrastructure, and trading records; Yagudayev served as Fehu's Chief Operating Officer, held his equity interest through Yehuda Capital LLC, and personally solicited Corradino's investments in Fehu and made the representations upon which Corradino relied.

368. Defendant Migirov occupied the status of a person controlling Fehu, or performing similar functions, and materially aided in the sale of the Fehu interests and in the conduct giving rise to Fehu's liability within the meaning of N.J.S.A. 49:3-71(d). At all relevant times, Migirov served as the Fund Manager of Fehu and as managing director of Fehu and Fehu Capital Partners, LLC, directed the fund's operations and the administration of investor accounts, controlled communications with investors regarding redemptions, and directed the fund administrator, NAV Fund Services.

369. Neither Shestakov, Yagudayev, nor Migirov can sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of the existence of the facts giving rise to Fehu's liability. As alleged herein, Shestakov was the architect of the fraud and maintained two sets of books for Fehu; Yagudayev and Migirov had specific, contemporaneous

knowledge of Shestakov's misconduct, Fehu's lack of internal controls, and the falsity of the representations made to Corradino; and Migirov, as Fund Manager, knew or was reckless in not knowing that substantial investor funds were being misappropriated from Fehu and/or utilized for personal trades by Shestakov.

370. By reason of the foregoing, Shestakov, Yagudayev, and Migirov are jointly and severally liable to Corradino and Hanley under N.J.S.A. 49:3-71(d) for all damages sustained by Corradino and Hanley in connection with their investments in Fehu, including the consideration paid for the securities together with interest and costs, in amounts to be proven at trial.

### COUNT XVII

### Breach of Fiduciary Duty

### (By Corradino and Hanley Against Migirov)

371. Plaintiffs repeat and re-allege each of the allegations of the foregoing Paragraphs as if set forth fully herein.

372. At all relevant times, Migirov served as the Fund Manager of Fehu and held a pivotal role in the management and execution of the Crypto Companies' trading operations.

373. By virtue of his position as Fund Manager of Fehu, Migirov owed fiduciary duties to Corradino and Hanley, as investors in Fehu, including duties of loyalty, care, and good faith.

374. Under New Jersey law, to establish a claim for breach of fiduciary duty, a plaintiff must show that: (1) the defendant had a duty to the plaintiff; (2) the duty was breached; (3) injury to the plaintiff occurred as a result of the breach; and (4) the defendant caused that injury.

375. Migirov breached his fiduciary duties to Corradino and Hanley by participating in a coordinated scheme with Shestakov and Yagudayev to siphon Crypto Company assets and client moneys invested by Fehu into wallets controlled by Shestakov, for the benefit of Shestakov, Gen. Shestakov, Stan. Shestakov, Yagudayev, and Migirov, and with their knowledge and assistance.

74

376. Specifically, while serving as Fund Manager of Fehu, Migirov ignored the disappearance of substantial investor funds and, on information and belief, worked with Shestakov to facilitate the diversion of investor assets by Shestakov for the benefit of Shestakov, Gen. Shestakov, Stan. Shestakov, Yagudayev and Migirov.

377. Migirov further participated in concealing the theft, including by assisting in the falsification of corporate records to conceal shortfalls.

378. As a direct and proximate result of Migirov's breaches of fiduciary duty, Plaintiffs have been injured. Plaintiff Corradino has $550,000 in unreturned principal invested with Fehu, in addition to hundreds of thousands of dollars in purported gains reflected on his Fehu account statements, and Plaintiff Hanley has $100,000 invested in Fehu that remains unreturned.

379. On information and belief, Migirov has directed the fund administrator, NAV Fund Services, not to respond to Corradino's requests or inquiries regarding his remaining funds or those of Hanley, further evidencing Migirov's knowing participation in and perpetuation of the scheme to deprive Plaintiffs of their investments.

380. By virtue of the foregoing, Corradino and Hanley have been damaged in an amount to be proven at trial, but not less than $550,000 and $100,000, respectively.

## COUNT XVIII

## CONVERSION

### (By Corradino and Hanley Against Migirov)

381. Plaintiffs repeat and re-allege each of the allegations of the foregoing Paragraphs as if set forth fully herein.

382. Under New Jersey law, conversion requires a repudiation by the defendant of the owner's right, or some exercise of dominion over property inconsistent with such right, or some act done which has the effect of destroying or changing the quality of the chattel. Conversion is

the intentional exercise of dominion and control over chattel that seriously interferes with the right of another to control that chattel.

383.    Plaintiffs invested funds in Fehu, including $2.95 million invested by Plaintiff Corradino and $100,000 invested by Plaintiff Hanley. These funds belonged to Plaintiffs and were identifiable. In addition, Corradino's Fehu account statements reflected hundreds of thousands of dollars in purported gains prior to the time that Corradino began to withdraw his investment.

384.    Migirov, as Fund Manager of Fehu, exercised wrongful dominion and control over Plaintiffs' invested funds in a manner inconsistent with Plaintiffs' rights in that property by participating in the scheme to siphon Plaintiffs' invested capital into wallets controlled by Shestakov and by knowingly permitting the misappropriation and dissipation of Corradino's and Hanley's funds for purposes other than the investment strategies represented to Corradino and Hanley.

385.    In or around late October 2025, Corradino demanded the return of his funds from Fehu, requesting withdrawals of $300,000 on behalf of his sister and $900,000 for himself. On November 6, 2025, Corradino emailed Migirov directly stating that he was waiting to receive the requested withdrawals. On November 11, 2025, Corradino sent Migirov a letter, copying the Shestakovs and Yagudayev, pressing for the return of the requested funds.

386.    Migirov refused full compliance with Plaintiffs' demands. Fehu advised Corradino that it would only be able to disburse $750,000 "in the near term" and that it would disburse the remaining amount "at a later time."

387.    Although the $900,000 and $300,000 requested in November 2024 was, after significant delays, ultimately returned, subsequent attempts by Corradino and Hanley to withdraw their remaining moneys from Fehu have been met with intransigence by Migirov, who has

76

apparently directed the fund administrator, NAV Fund Services, not to respond to Corradino's requests or inquiries.

388. By virtue of Migirov's wrongful exercise of dominion and control over Plaintiffs' property and his refusal to return or disburse Plaintiffs' investments upon demand, Migirov has committed conversion. Corradino and Hanley have been damaged in an amount to be proven at trial, but not less than $550,000 and $100,000, respectively, in unreturned principal.

## COUNT XIX

## UNJUST ENRICHMENT

### (By All Plaintiffs Against All Defendants)

389. Plaintiffs repeat and re-allege each and every allegation contained in the foregoing paragraphs of this Complaint as if set forth fully herein.

390. Under New Jersey law, to establish a claim for unjust enrichment, a plaintiff must show that: (1) the defendant received a benefit; and (2) the retention of that benefit without payment would be unjust. Retention without payment is unjust where, had the true facts been known to the plaintiff, the plaintiff would have expected remuneration from the defendant at the time the benefit was conferred.

391. Plaintiffs invested approximately $4.2 million in the Crypto Companies, of which at least $1.5 million remains unrecovered. On information and belief, these funds conferred a direct benefit upon Shestakov, Gen. Shestakov, Stan. Shestakov, Yagudayev, Migirov, Shestakov Enterprises LLC, and Yehuda Capital LLC, each of whom received funds or profited from the money wrongfully diverted from the Crypto Companies.

392. Specifically, Shestakov received Plaintiffs' funds through surreptitious and unauthorized withdrawals that siphoned investor capital from the Crypto Companies into wallets he controlled, and through the sale to Corradino of a worthless digital asset for $250,000. Gen.

Shestakov participated in the looting of investor money alongside Shestakov and, on information and belief, has received from Shestakov funds wrongfully misappropriated from the Companies. Stan. Shestakov participated in the management and/or execution of the schemes through which Plaintiffs' funds were diverted and, on information and belief, has received from Shestakov funds wrongfully misappropriated from the Companies. Yagudayev received Plaintiffs' funds through the sale to Corradino of a worthless digital asset for $250,000 and through other diversions. Migirov received funds or profited from the money wrongfully diverted through his role as Fund Manager. Shestakov Enterprises LLC, as the vehicle through which the Shestakov family held equity interests in the Crypto Companies, received funds or profited from the wrongful diversion of Plaintiffs' investments. Yehuda Capital LLC, as the vehicle through which Yagudayev held his equity interests in the Crypto Companies, received funds or profited from the wrongful diversion of Plaintiffs' investments.

393.    Had Plaintiffs known the true facts—including that the Crypto Companies lacked internal controls, that Shestakov had a documented history of misappropriating investor funds, that the Crypto Companies were experiencing acute liquidity crises, and that their investments would be diverted for the personal benefit of Defendants rather than deployed as represented—Plaintiffs would not have made or maintained their investments.

394.    It would be inequitable for Defendants to retain the benefits conferred upon them by Plaintiffs' investments, which were procured through wrongful means and diverted for Defendants' personal enrichment rather than for their intended investment purposes.

395.    By virtue of the foregoing, Defendants have been unjustly enriched at Plaintiffs' expense. Plaintiffs are entitled to disgorgement of the amounts wrongfully received or retained by each Defendant, in an amount to be proven at trial.

## COUNT XX

## ACCOUNTING

### (By Corradino and Hanley Against Migirov and Fehu)

396.    Plaintiffs repeat and re-allege each of the allegations of the foregoing Paragraphs as if set forth fully herein.

397.    Under New Jersey law, an accounting in equity may be compelled on the basis of: (1) the existence of a fiduciary or trust relationship; (2) the complicated nature or character of the account; and (3) the need for discovery.

398.    As set forth above, Migirov, as Fund Manager of Fehu, stood in a fiduciary relationship with Plaintiffs as investors in Fehu.

399.    The accounts at issue are complicated in nature and character, involving cryptocurrency transactions across multiple platforms and wallets, a byzantine series of transfers designed to conceal the movement of funds, the use of automated withdrawals clustered in off-hours to avoid detection, vault-to-vault transfers embedding concealed external payments, and falsified reconciliation records with overwritten formulas and backdated trades.

400.    Plaintiffs have a need for discovery because Defendants maintained exclusive control over Fehu's databases, backend infrastructure, and trading records, and the Crypto Companies ceased producing statements regarding Fehu's returns or other information regarding Plaintiffs' investments following the filing of the Yagudayev Complaint.

401.    The value of Corradino's and Hanley's gains in their respective Fehu accounts, and whether those gains were real or fictitious, cannot be determined without an accounting, because only records controlled by Fehu and Migirov can show the value of Corradino's and Hanley's losses.

402. By reason of the foregoing, Corradino and Hanley are entitled to a full and complete accounting from Migirov and Fehu of all funds received from Corradino and Hanley, the disposition of those funds, all transactions made with or involving their respective investments, and the current status and location of any remaining assets traceable to their investments.

## COUNT XXI

## CONSTRUCTIVE TRUST

**(By All Plaintiffs Against Shestakov, Yagudayev, Migirov, FlexFills, FF Digital, and Fehu)**

403. Plaintiffs repeat and re-allege each and every allegation contained in the foregoing paragraphs of this Complaint as if set forth fully herein.

404. Under New Jersey law, a constructive trust will be imposed when a person has acquired possession of or title to property under circumstances that, in good conscience, do not permit its retention. A constructive trust requires a two-part showing: (1) that a wrongful act caused the property to come into the hands of the recipient; and (2) that the recipient will be unjustly enriched if the property is not returned.

405. Where a wrongdoer obtains funds at the expense of another and those funds can be traced into other property or proceeds, the wronged party is entitled to reach that property and impose a constructive trust upon it.

406. As set forth in the foregoing paragraphs and Counts, Shestakov, Yagudayev, and Migirov committed wrongful acts—including common law fraud, securities fraud, breach of fiduciary duty, conversion, and the misappropriation, diversion, and/or laundering of Plaintiffs' invested funds—that caused Plaintiffs' property to be transferred to and diverted among these Individual Defendants.

407. Plaintiffs' funds are identifiable property: Corradino's $300,000 invested in FlexFills, JCPE's $550,000 invested in FF Digital, and Corradino's and Hanley's investments in

Fehu. FlexFills, FF Digital, and Fehu each directly received the respective investments of Plaintiffs through the wrongful acts alleged herein, and Fehu continues to reflect unreturned principal belonging to Corradino and Hanley in their Fehu accounts.

408. Shestakov, Yagudayev, and Migirov each received, and hold, property traceable to Plaintiffs' funds: Shestakov siphoned investor and company funds into wallets and personal accounts under his control, routing misappropriated assets through a series of obfuscatory transfers and ultimately into the Destination Wallet holding approximately 99.10 BTC; Yagudayev and Shestakov each received $250,000 from Corradino for a worthless "node" and otherwise improperly utilized corporate funds for their personal expenses or received diverted funds; and Migirov, on information and belief, received funds or profited from the money wrongfully diverted through his role as Fund Manager.

409. Each of these Defendants would be unjustly enriched if permitted to retain the property and proceeds traceable to Plaintiffs' funds, and none of them is a bona fide purchaser for value, because Plaintiffs' funds were obtained through fraud and the securities and assets that Plaintiffs received in exchange are worthless.

410. Accordingly, Plaintiffs are entitled to the imposition of a constructive trust upon all property, funds, and proceeds in the possession, custody, or control of Shestakov, Yagudayev, Migirov, FlexFills, FF Digital, and Fehu that are traceable to Plaintiffs' investments—including, without limitation, the Destination Wallet and the balances in Plaintiffs' Fehu accounts—together with an order requiring each such Defendant to account for and convey that property to Plaintiffs.

## **<u>PRAYER FOR RELIEF</u>**

**WHEREFORE**, Plaintiff respectfully requests that the Court enter judgment in their favor against Defendants, jointly and severally, and award the following relief:

a) Directing Defendants to provide a verified accounting of all funds and assets received from

81

Plaintiffs;

b)  Compensatory damages, consequential, direct, and indirect damages;

c)  Disgorgement of any profits obtained by Defendants through the improper use of Plaintiffs' investment funds;

d)  Punitive and/or exemplary damages for Defendants' egregious and fraudulent conduct;

e)  Imposing a constructive trust over assets derived from or traceable to Plaintiffs' funds;

f)  An accounting of funds invested by Plaintiffs in the Crypto Companies;

g)  Counsel fees and costs of suit;

h)  Prejudgment and post-judgment interest; and

i)  Any other relief that this Court deems just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby requests a trial by jury on all issues and claims so triable.

**BRACH EICHLER LLC**
*Attorneys for Plaintiff*

_____
Keith J. Roberts, Esq.

Dated: July 6, 2026